[1] We note that Watson Lewis died after this suit was commenced. The record indicates, however, that his son, Samuel N. Lewis, was substituted as a plaintiff in his capacity as executor of his father's estate.
On December 20, 1983, Susie T. Lewis and others,[2] filed an action to quiet title in Choctaw County Circuit Court against Harkins Company, Inc., and others,[3] alleging, inter alia, that they were remaindermen as to an undivided one-fourth interest in a 40-acre tract of land in Choctaw County and that they were entitled to be compensated for the oil that had been extracted from that land by the defendants. The case went to trial before a jury on September 29, 1986; however, the trial court directed a verdict for the plaintiffs at the close of all the evidence and entered judgment accordingly. The defendants filed a post-trial motion seeking to have the judgment altered, amended, or vacated or, in the alternative, seeking a new trial. That motion was denied. Defendants appeal. We affirm.
The trial court's judgment recites the following undisputed facts:
"The land which is the subject of this litigation is the Southeast Quarter of [the] Northwest Quarter of Section Ten (10), Township Ten (10) North, Range Three (3) West, in Choctaw County, Alabama. By stipulation of all of the parties, the four children of Victoria Lewis Abston, who were Lorena McIlwain, Minnie V. Evans, Watson Lewis, and Ruby Lewis, inherited the fee simple title to the subject property from their grandfather, Allen Abston, upon his death. Allen Abston died in 1921, intestate, and leaving numerous heirs at law and next of kin, including, in addition to the above-named children of his deceased daughter, Victoria, a son by the name of J.T. (Jase) Abston who was, of course, an uncle of Victoria's four children. In 1927, Lorena McIlwain and her husband, B.E. McIlwain, Minnie V. Evans and her husband, J.F. Evans, and Watson Lewis and his wife, Susie Lewis, joined in the execution of a deed to the uncle, J.T. Abston, which described the subject property. . . . The grantors are described in the instrument as 'we the undersigned heirs of B.A. Lewis, Dec'd.' The recited consideration is Two Hundred Dollars. In the granting clause of the deed the printed language includes the phrase, 'do hereby grant, bargain, sell and convey unto said party of the second part the following described property . . .' The printed warranty clause reads as follows:
 " 'And the said parties of the first part, for them and their heirs, covenant with the said party of the second part that they are lawfully seized in fee simple of said premises; that they are free from all incumbrances; that they have a good right to sell and convey the same as aforesaid, and that they will forever warrant and defend the same unto the party of the second part, and his heirs and assigns, against the lawful claims and demands of all persons.'
 "The space for signatures is arranged and set out in the following fashion:
/s/ B.E. McIlwain(SEAL)
/s/ Watson Lewis
/s/ J.F. Evans(SEAL)
/s/ Susie Lewis(SEAL)
/s/ Lorena McIlwain(SEAL)
__________(SEAL)
/s/ Minnie V. Evans(SEAL)
"On the reverse side of the . . . deed, the first notarial acknowledgement, dated November 3, 1927 contains the customary certification of the notary public that B.E. McIlwain, Watson Lewis, John Evans acknowledged the execution of the document. *Page 107 
However, in this particular . . . acknowledgement, following the typed names of McIlwain, Lewis and Evans is the typed name of Ruby Lewis. Superimposed on the name of Ruby Lewis are handwritten 'X' marks, indicating that her name was deleted from the acknowledgement. The acknowledgement of the three men is followed by the separate acknowledgement of the three wives. This deed was recorded in the Probate Court of Choctaw County on May 1, 1931.
"According to the undisputed testimony, Ruby Lewis was living at the time of the execution and delivery of the above-described deed (hereinafter referred to as the 1927 deed), and subsequently married Holford Smith. She subsequently died without descendants or parents surviving, leaving her husband, Holford Smith, surviving, and her two sisters, Lorena and Minnie and [her] brother, Watson, as her surviving heirs at law and next of kin.
"Her surviving husband (also known as H.G. Smith) executed a deed dated March 22, 1930 for a recited consideration of fifty dollars to J.T. Abston. . . . This document also contains in the granting clause the customary language, 'do hereby grant, bargain, sell and convey . . .' followed by the description of the subject property. Written by hand below the description of the property and before the habendum and warranty clauses, is the following legend:
 " 'This deed is meant to convey one-fourth interest which is all I have in the above described land[.]'
"This deed was duly acknowledged on March 22, 1930 and was recorded on the [same] date and [at the same] time as the 1927 deed. It will be sometimes hereinafter referred to as the 1930 deed.
"At the time of the execution of the 1927 deed, Lorena, Minnie, Watson and Ruby, were all well acquainted with their uncle, J.T. Abston, and he was well acquainted with them. . . . They all lived in reasonably close proximity to each other, in Choctaw County, at the time. Although the recited consideration in the deed was two hundred dollars, Lorena, Minnie and Watson were each paid $50.00 by their uncle upon execution of the deed. Susie Lewis, the widow of Watson Lewis, testified that she and Watson did not have the deed prepared. The father of the four children of Victoria Abston Lewis was B.A. (Ben) Lewis. After the death of Victoria, he remarried Annie Donald, and there were nine children born of that marriage, all of whom survived his death. B.A. Lewis died prior to the time of the execution of the 1927 deed. Thus, at the time of that deed, the 'heirs of B.A. Lewis' included the four children of Victoria and some nine additional children of the second marriage. Also, of course, the husbands of Lorena and Minnie and the wife of Watson, who also executed the 1927 deed, were not heirs of B.A. Lewis.
"According to the testimony of Defendants, James Abston and H.A. Abston, their father, J.T. Abston, entered into possession of the subject property following receipt of the 1927 deed and sometime thereafter fenced it. At that time only a few acres consisted of open land. They and another witness, W.A. Long, assisted J.T. Abston in clearing enough of the land so that as much as 20 or 30 acres was eventually placed in cultivation. The timber which was cleared off of the land to make farmland out of it was piled and burned. J.T. Abston and his family farmed the land, growing various crops on it until about 1942, during the early part of World War II. After that time and until the death of J.T. Abston in 1962 the property was not used to grow crops, but was left to grow timber and for raising cattle. James Abston was away in the service from 1942 to 1945. Between the time of his return and about 1948-1950, while the land was being used for pasture, 'a load or two of ties' were cut and sold, but there was no testimony as to what consideration was received. Following the death of J.T. Abston, title to the surface passed to H.A. Abston and the mineral interests owned by J.T. Abston passed in equal shares to H.A., James, and [defendant Irene Abston Jones, J.T. Abston's daughter]. H.A. Abston did not use the land for farming or cattle. He allowed the timber to grow on the property. According to his testimony, after Hurricane *Page 108 
Frederic in 1979, he sold the downed timber from the subject property for pulpwood. Also, about four years ago, he sold off about 25 cords of pulpwood in order to thin out the timber. There was no testimony as to how much was received from the sale of the timber on either of these two occasions, but H.A. Abston received and retained all of the proceeds.
"From 1928 up to and including the present time, the property taxes on the subject property have been assessed and paid exclusively by J.T. Abston and [H.A. Abston, James Abston and Irene Abston Jones, hereinafter referred to as] the Abston Defendants. Oil, gas and mineral leases for primary terms of five or ten years were executed by J.T. Abston or his widow in 1940, 1954, 1964 and 1969, each having been recorded in the Probate records of Choctaw County, but there is no evidence that there was any drilling, exploration or production under those leases.
"H.A. Abston and James Abston both testified that their father claimed to own the land and that after his death, H.A. claimed to own the surface and they and their sister claimed to own the minerals, up to the present time. Two additional witnesses for the Defendants, Hubert Gibson and Edward Gibson, both of whom lived in close proximity to the subject property, testified that they had always understood that J.T. Abston owned the property, and, after his death, that H.A. Abston owned the property.
"Under date of February 14, 1975, the Abston Defendants and their spouses executed an oil, gas and mineral lease for a primary term of three years on the subject property to [defendant] Wil-Ken, Inc., reserving a one-eighth royalty interest, which lease was recorded in Choctaw County March 26, 1975. Various interests in this lease were subsequently assigned to the other [defendants, hereinafter referred to as the] Working Interest Defendants, all of such assignments also having been recorded in Choctaw County. [One of the Working Interest Defendants was Harkins Company, Inc. (hereinafter referred to as Harkins), which] obtained a permit from the State Oil Gas Board of Alabama and successfully drilled a well on the subject 40 acres, which was completed as a producing well in November, 1975. Harkins subsequently filed a petition with the Oil Gas Board to force integrate a 130-acre unit which included the subject 40 acres, and the Board issued its order of forced integration of the 130-acre unit on September 22, 1976. None of the Plaintiffs or their predecessors in title joined in or consented to the petitions for drilling the well, or for establishing either the 40-acre unit or the later 130-acre unit.
"Included in the exhibits in this case is the complete monthly record of barrels of oil produced from the subject well, the total monthly sales in barrels and amounts in money from such sales, and the expenses paid by Harkins as the operator, attributable to the subject well, from the beginning through July, 1986. Also included in the record is the complete list provided by Harkins of the identity of each person, firm, corporation, or other entity which has been paid from the net production from the subject well to and including July 31, 1986, accounting for 100% of such proceeds. None of the Plaintiffs or their predecessors in title have been paid any such proceeds. The payments described above commenced in 1975 and have continued up to the present date, although the record reflects only those payments made through July, 1986. Until September 22, 1976, all of the net proceeds from the well were paid only to those parties determined by Harkins to have an interest in the subject 40 acres. On and after September 22, 1976, the payments have been made to those determined by Harkins to have an interest in the 130-acre unit.
"Only two of the plaintiffs testified. One was Susie Lewis and the other was Myrtle Evans Abston, a daughter of Minnie V. Evans. Each testified that she had not asserted a claim to an interest in the subject property until sometime after the well was drilled. H.A. Abston and James Abston both testified that none of the Plaintiffs or their predecessors in title had made known to them that they claimed an interest in the subject property. The witnesses, *Page 109 
W.A. Long, and Hubert and Edward Gibson, testified that, prior to the drilling of the well, they had never heard of any of the Plaintiffs or their predecessors in title claiming an interest in the property. William Utsey, [a] lawyer practicing in Choctaw County, who lived all his life in the general vicinity of the subject property and who knew many of the Plaintiffs and their predecessors in title personally, and who examined the title to the subject property and provided drilling and division order opinions with respect to the same, testified that prior to the drilling of the well, he had not heard that any of the Plaintiffs or their predecessors in title claimed an interest in the subject property. James Abston testified that a year or two after the well was discovered he began to hear that one or more of the Plaintiffs or their predecessors in title claimed an interest in the property. Utsey testified that he received this same information from James Abston in 1977.
"The only persons who were physically in possession of the subject property after the 1927 deed were J.T. Abston and one or more of the Abston Defendants. While in such possession they claimed to be the 'owners'. However, there is no evidence whatsoever that J.T. Abston at any time during his lifetime told or otherwise communicated to his niece, Ruby, after the 1927 deed, that he claimed to possess the subject property adversely as to her; or had a conversation with or otherwise communicated to Lorena, Minnie or Watson, during the remainder of his lifetime, that he possessed or claimed adversely as to any remainder interest which they had or may have had, in the subject property. Both James Abston and H.A. Abston acknowledged that they never discussed the ownership or possession of the subject property with Lorena, Minnie or Watson, or with any of the Plaintiffs. There is no evidence whatsoever in the record that any of the Abston Defendants ever at any time had a conversation with or otherwise informed or communicated to the Plaintiffs or their predecessors in title the fact that they claimed ownership or possession of the subject property adversely to the remainder interest which any of them had or may have had in the subject property. At no time did Harkins . . . or anyone else contact the Plaintiffs or their predecessors in title for the purpose of requesting or obtaining an oil, gas or mineral lease on the subject property.
"[Plaintiff] Lorena McIlwain is presently 84 years old and did not testify. Minnie V. Evans died in 1965, intestate, leaving a husband, Gordon Roberts, surviving. Many of the Plaintiffs are identified in the record as her descendants. According to the undisputed testimony, Watson Lewis became incompetent and unable to manage his own affairs in 1969, and remained so until the time of his death after the filing of this litigation. He was adjudged non compos mentis by the Probate Court of Choctaw County, and Plaintiff, Susie Lewis, was appointed his guardian on August 12, 1977, and joined in the filing of the complaint in that capacity. Following his death his will was admitted to probate and his son, Sam Lewis, was issued letters testamentary. He, individually, and in that capacity, together with all of the other heirs and devisees of Watson Lewis, are identified in the record and are Plaintiffs.
"Joseph W. Hutchinson III in the period of 1975-1976 was engaged in the timber and pulpwood business in Choctaw County with his father. Because of the nature of his business he was well acquainted with a number of the Plaintiffs. Sometime during that period, after the drilling of the well, one of the Plaintiffs discussed with him the possibility of having an interest in the subject property by way of inheritance from Ruby Lewis Smith, through his mother, Minnie V. Evans. In 1982, while Hutchinson was a student in law school, he was again approached by one or more of the Plaintiffs, at which time they requested his assistance in establishing their interest in the property. He made an investigation of the facts and undertook some legal research, and ultimately acquired quitclaim deeds from all of the Plaintiffs for an undivided one-half interest in their title to the oil, gas and minerals in the subject property, in exchange for his commitment to employ attorneys to represent himself and *Page 110 
them in the litigation and to defray all of the expenses of the litigation, which he then undertook to do. The Probate Court of Choctaw County validly approved the execution of such deeds by the two plaintiff-guardians.
"Kendall Hanby, of the Tuscaloosa firm of Tom Joiner 
Associates, Inc., testified as an expert consulting geologist and petroleum engineer. On the basis of the production, sales and expense data provided by Harkins with respect to the subject well from its inception through July, 1986, together with his knowledge of the applicable severance tax, windfall profits tax, interest rates and inflation factors, all of which conformed with the accepted practices in the oil and gas industry for determining the present worth as of July 31, 1986 of the production from the well on the subject property attributable to an undivided one-fourth interest in the 40 acres comprising the subject property, he testified that he determined such present worth. . . . No contrary or conflicting evidence was introduced and his calculations and opinions were neither challenged nor contradicted."
Four issues were presented for our review:
 I. Whether the trial court erred to reversal in denying Harkins's counsel of choice the opportunity of fully participating in the trial.
 II. Whether the trial court erred in its determination that the doctrine of estoppel to assert after-acquired title was not applicable to establish title in the Abston Defendants.
 III. Whether the trial court erred in directing a verdict for the plaintiffs with respect to the affirmative defenses raised by the defendants — adverse possession, laches and the 20-year rule of repose.
 IV. Whether the damages awarded by the trial court were excessive due to the alleged failure of the plaintiffs to mitigate their damages.
 I.
Whether the trial court erred to reversal in denying the Working Interest Defendants'counsel of choice the opportunity of fully participating in the trial.
The facts material to a resolution of this issue, which were not set out in the trial court's judgment, are as follows: The trial court, on motion of the plaintiffs, disqualified the Working Interest Defendants' attorney, William L. Utsey,[4] from fully participating in the trial of the case because of the possibility that he might be called as a witness by the plaintiffs. The court did allow Mr. Utsey to participate in the selection of the jury. Mr. Utsey, who was well acquainted with the history of the case, prepared all of the title opinions upon which Harkins relied prior to extracting the oil in question and represented Harkins before the Oil and Gas Board regarding the forced integration of the subject oil well. The plaintiffs stated in their motion that they had listed Mr. Utsey as a material witness to be called at trial; that Mr. Utsey's presence as defense counsel would place them at a disadvantage "because of the long-established rule that a lawyer appearing as counsel for a party in court is an 'officer of the court,' which appellation clothes any such lawyer with an aura of authority and integrity which is due to impress a jury to the disadvantage of any party seeking to examine the lawyer under such circumstances as a witness, particularly as an adverse witness"; and, that Harkins would not be prejudiced if Mr. Utsey was disqualified because it was represented by other competent counsel. The plaintiffs did not call Mr. Utsey to testify at the trial. Mr. Utsey did, however, testify as a witness for the defense.
The defendants contend that, by disqualifying Mr. Utsey, the trial court denied the Working Interest Defendants their right to have the counsel of their choice; therefore, they argue that the trial court erred in denying their motion for new trial. *Page 111 
Harkins relies primarily on National Filtronics, Inc.v. Sherwood Land, Ltd., 428 So.2d 11, 13-15 (Ala. 1983). In that case, Sherwood Land, Ltd. ("Landlord"), filed suit against National Filtronics, Inc. ("Tenant"), seeking cancellation of a lease. The trial court entered judgment for Sherwood, and National Filtronics appealed, arguing that the trial court had abused its discretion in denying its counsel the opportunity of participating in the trial after being called as an adverse witness by Sherwood. The Court, holding that National Filtronics had been denied counsel of its choice and, consequently, was entitled to a new trial, wrote:
"DR 5-102(B), cited by Landlord states:
 " 'If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.
" '. . . .
 " '(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:
 " '(1) If the testimony will relate solely to an uncontested matter.
 " '(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
 " '(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
 " '(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.
 " 'DR 5-102 Withdrawal as Counsel When the Lawyer Becomes a Witness.
 " '(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B)(1) through (4).'
 "It is clear from the relevant rules and interpretative cases that an attorney should be disqualified from continued employment where he elects to become a witness for his client concerning a disputed question of fact relating to the merits of the cause, if such withdrawal would not 'work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.' DR 5-101(B)(4). See Alexander v. Watson, 128 F.2d 627 (4th Cir. 1942); Miller Electric Const., Inc. v. Devine Lighting Co., 421 F. Supp. 1020
(W.D.Pa. 1976). [Emphasis added in National Filtronics.]
 "It is equally clear, however, that a lawyer may continue his representation of his client when he anticipates being called as a witness other than for his client, so long as it is not apparent that his testimony is or may be prejudicial to his client. When the two subsections of DR 5-101 are contrasted, it is readily apparent that prejudice to the client is the sole consideration in determining whether withdrawal from current employment is appropriate when the lawyer knows that he 'may be called as a witness other than on behalf
of his client' (emphasis added), as opposed to when it is apparent that the lawyer 'ought to be called as a witness on behalf of his client' (emphasis added). In the latter situation, where the lawyer is making the decision, the lawyer is allowed to continue representation only if he falls within one of 'the circumstances enumerated in DR 5-101(B)(1) through (4).' *Page 112 
 "In the case at bar, Mr. Ritchey fell into the category of DR 5-102(B), because he was called by the opposing attorney as an adverse witness. Therefore, a consideration of the circumstances in DR 5-101(B) is irrelevant. A brief consideration of Mr. Ritchey's testimony, however, is relevant in order to ascertain whether such testimony was prejudicial to his client.
". . . .
 "We have found nothing in the testimony that was, or could have been, prejudicial to Tenant. This is not to say that the totality of the circumstances testified to by Mr. Ritchey, when taken together with all the other evidence, did not furnish the basis for certain inferences supportive of ultimate conclusions of fact unfavorable to Mr. Ritchey's client. But this is far different from the giving of testimony prejudicial to his client as contemplated by DR 5-101. Indeed, Mr. Ritchey with justification could, and undoubtedly would, have contended for the contrary inferences of fact from the same testimony. Additionally, Mr. Ritchey's personal interests, if any, were completely compatible with that of his client.
 "A trial judge's discretionary power to disqualify an attorney under DR 5102(B) is not invoked until the threshold test of possible prejudice is met; therefore, disqualification by the trial judge under these circumstances was unwarranted.
 "Landlord's harmless error argument is also without merit. The undisputed fact that Tenant was represented by other competent counsel begs the question. The right of private counsel of one's own choice is virtually absolute; and any denial of that right is subject to strict scrutiny, particularly where, as here, there is no question concerning the challenged lawyer's availability and willingness to serve, and where the facts fall short of invoking the ethical considerations posed by the Canons of Professional Responsibility."
In the present case, Harkins argues that the grounds stated by the plaintiffs in their motion were not sufficient to warrant the disqualification of Mr. Utsey. We agree. A lawyer may continue his representation of his client even when he anticipates being called as a witness other than for hisclient, so long as it is not apparent that his testimony is or may be prejudicial to his client. The fact that the plaintiffs anticipated calling Mr. Utsey as an adverse witness was not a sufficient ground for disqualification, in the absence of a showing that his testimony would be prejudicial to his clients. The record does not indicate to us that the plaintiffs made such a showing prior to the trial court's ruling. We note also that Mr. Utsey was, in fact, called to testify on behalf of the defense. Furthermore, as the Court stated in National Filtronics, "prejudice to the client is the sole consideration in determining whether withdrawal from current employment is appropriate when the lawyer knows that he 'may be called as a witness other than on behalf of his client' " (emphasis added in National Filtronics); therefore, even though a lawyer is an "officer of the court" and, we hope, is held in high esteem by members of the jury, he is not to be disqualified because he is "cloth[ed] . . . with an aura of authority and integrity." Integrity, like thoroughness of preparation on behalf of one's client, is a hallmark of professional competence, which is fostered rather than condemned by the code governing the lawyer's conduct,Alabama Code of Professional Responsibility.
Finally, representation by other competent counsel is not a sufficient ground upon which to disqualify a party's counsel of choice. This "harmless error" argument was considered and rejected by the Court in National Filtronics;
therefore, the Working Interest Defendants could not be denied Mr. Utsey's representation simply because they had other competent counsel available for trial.
Our inquiry, however, must not end here. It is well established that if the ultimate decision of a trial court is correct, that decision will be upheld on appeal, even though the wrong reason may have been *Page 113 
given. See cases collected at 2A Ala. Digest, Appeal Error § 854(2) (1982). We must, therefore, test the propriety of the trial court's ruling against an alternative basis for its denial of Mr. Utsey's right of participation as counsel: That Mr. Utsey's continued representation would have been violative of the Alabama Code of ProfessionalResponsibility provision dealing with withdrawal of counsel when the lawyer "learns or it is obvious that he . . . ought to be called as a witness on behalf of hisclient." DR 5-102(A). (Emphasis added.) As previously noted, Mr. Utsey was apparently the one individual most familiar with the history of the case, having prepared all of the title opinions upon which Harkins relied prior to drilling the well and having represented Harkins before the Oil and Gas Board regarding the forced integration of that well. Our review of the record also indicates that at the time the trial court ruled on the plaintiffs' motion, the plaintiffs were claiming that Harkins was liable in conversion for compensatory as well as punitive damages.[5]
This claim was based on allegations that Harkins had drilled the well and extracted the oil with full knowledge of the plaintiffs' remainder interest or, alternatively, had acted in wanton disregard of the plaintiffs' rights by not undertaking to "determine from the information available to it in the public records and elsewhere, upon reasonable inquiry, . . . the rights of the plaintiffs."
The word "ought" as used in the context of DR 5-102(A), is defined in Webster's Ninth New Collegiate Dictionary
(1981) as a "verbal auxiliary" that is "used to express . . . advisability." Our review of the record in the case at bar convinces us that at the commencement of the trial, it was clearly advisable for Mr. Utsey to testify on behalf of his clients, concerning his examination of the chain of title, as well as the circumstances surrounding Harkins's decision to drill on the land and extract the oil. Our view in this regard is supported, in part, by the fact that Mr. Utsey did later take the stand on behalf of his clients. Under these circumstances, we cannot hold the trial court in error for disqualifying Mr. Utsey.[6]
 II.
Whether the trial court erred in its determination that the doctrine of estoppel to assert after-acquired title was not applicable to establish title in the Abston Defendants
It is well established in Alabama that if a grantor of real property having lesser title than he assumed to grant subsequently acquires the title or estate that he purported to convey, such after-acquired title inures to the benefit of the grantee or his successors by way of estoppel of the grantor or those claiming under him. See Trauner v.Lowrey, 369 So.2d 531 (Ala. 1979). The defendants contend that the 1927 deed is unambiguous in that the grantors therein purported to convey the entire interest in the property to J.T. Abston, including the interest that was owned by Ruby Lewis. Thus, they argue, Ruby Lewis's interest in the property later passed to her brother and sisters (the grantors in the 1927 deed) by intestate succession and, therefore, the Abston Defendants now own the entire interest in the property under the doctrine of estoppel to assert after-acquired title. We disagree.
A deed may have the effect of passing to the grantee a title subsequently acquired by the grantor. "A grantor who executes a deed purporting to convey land to which he has no title or to which he has a defective title at the time of the conveyance will not be permitted, when he afterward acquires a good title to the land, to claim in opposition to his deed as against the grantee or any person claiming title *Page 114 
under him." 23 Am.Jur.2d Deeds § 341 (1983). (Emphasis added.) The verb "purport" is defined inBlack's Law Dictionary (5th ed. 1979) as follows: "to have the appearance of being, intending, claiming, etc." In Clements v. Faulk, 181 Ala. 219, 225, 61 So. 264,266 (1913), the Court held that the covenants of warranty in a deed could refer only to the interest that the grantors "undertook, intended, and, in fact, conveyed." The Court went on to state that "[t]he covenants of warranty cannot be construed as covering any future interest which the grantors might by purchase or inheritance acquire . . . in the land, to which at the time of the conveyances . . . the said grantors had no right or title whatever, and to which by said conveyances they intend to convey no right or title whatsoever." Id. Although the Court in Clements
deemed it unnecessary to cite any authority, we note that earlier cases support its holding. See, for example,Wheeler v. Aycock, 109 Ala. 146, 151, 19 So. 497,499 (1895): "And this is the operation of the doctrine of after acquired title passing to a grantee, upon which the appellant relies. After-acquired title to the land, or interest in land, intended to be and in fact covered by a conveyance, enures to the grantee in the conveyance. But this is not to say, by any manner of means, that where one, after a conveyance of a certain interest in land, acquires title, not only to that interest, but also to all other interests in the property, the title to such other interests, as also that to the interest covered by the instrument, passes to the grantee." See, also, Stewart v. Anderson, 10 Ala. 504, (1846); Center v. P. M. Bank, 22 Ala. 743
(1853). Recent decisions of this Court are in accord, seeSprinkle v. American Mobilephone Paging,525 So.2d 1353 (Ala. 1988); Kelley v. Kelley, 435 So.2d 214
(Ala. 1983).
As the previous discussion illustrates, the resolution of this issue hinges on exactly what interests the grantors in the 1927 deed intended to convey, and, in fact, conveyed by that instrument. The trial court concluded that the 1927 deed was ambiguous and, thus, it looked beyond the "four corners" of the instrument in order to discern the intent of the grantors. A portion of the trial court's judgment reads as follows:
 "Under the law of this state at the time of the death of Ruby Lewis Smith, her undivided one-fourth interest in the subject property passed by the laws of intestacy in equal shares to her sisters, Lorena and Minnie, and her brother, Watson, subject to a curtesy interest in her surviving husband, Holford Smith, which was a life estate in the subject property, so that the interest inherited by Lorena, Minnie and Watson became a remainder interest, subject to the life estate. Defendants contend that the interest inherited by the sisters and brother passed to J.T. Abston under the provisions of the 1927 deed, through the application of the doctrine of after-acquired title. Defendants rely for this upon the granting and warranty clauses in the 1927 deed, and argue that the deed is clear and unambiguous. The Court disagrees. Without question, the doctrine of after-acquired title is firmly established in our jurisprudence, but it is not without limitations. It appears to have arisen in Alabama in the context of mortgages wherein, for a valuable consideration, the mortgagor purports to convey a fee simple title, which is subsequently determined to be defective, and where he thereafter acquired a title which cures the defect. See, for example, Stewart v. Anderson, 10 Ala. 504 (1846), and Center v. P. M. Bank, 22 Ala. 743
(1853). In both of those cases the Supreme Court applied the doctrine on the principle of estoppel. It was later extended to similar situations involving deeds. It is evident from a study of the case law that the doctrine is properly applied where it was the intention of the parties at the time of the initial conveyance that a certain title or interest be conveyed, which was not then presently owned, and which was subsequently acquired by the grantor, in order to give the original grantee and his assigns all that he bargained for and to prevent any unjust benefit to the original grantor. *Page 115 
"The doctrine does not apply where these elements are not present and where the intention of the parties is not to convey a title subsequently acquired. Thus, in Clements v. T.S. Faulk and Co., Inc., 181 Ala. 219, 61 So. 264 (1913), where two adult children deeded their undivided remainder interest by deeds of conveyance of warranty to Faulk and subsequently inherited the interest of a third child, a minor at the time, by intestacy, the Supreme Court refused to apply the doctrine, holding that the two adult children only conveyed the interest which they owned at the date of the conveyance, and that the covenants of warranty can only refer to the interest which they then undertook, intended, and in fact, conveyed and could not be construed as covering any future interests which they might by purchase or inheritance acquire, to which at the time of the conveyance they had no right or title whatsoever (see 181 Ala. at 266-267, 61 So. 264). Clements has been cited with approval in Moore v. McAllister, 205 Ala. 512, 88 So. 643 (1926). Powell v. Pearson, 220 Ala. 247, 256, 125 So. 39 (1929), and Merchants National Bank v. Hubbard, 220 Ala. 372, 374, 125 So. 335 (1929).
 "It is a fundamental precept of property law that courts should construe instruments so as to give effect to the intent of the parties. Initially, the court looks to the entire instrument. Second, the court looks to the factual situation and the circumstances existing at the time the instrument was created, and finally, the court may look to the subsequent acts of the parties to determine the correct construction of the instrument. See Brashier v. Burkett, 350 So.2d 309 (Ala. 1977), and African Methodist Episcopal Church v. St. Paul Methodist Church of Selmont, 362 So.2d 868, 872 (Ala. 1978).
 "Applying the principles discussed above, the Court concludes that the doctrine of after-acquired title does not apply. The 1927 deed does not name the grantors, describing them only as 'the undersigned heirs of B.A. Lewis — Dec'd.' The instrument is executed and acknowledged by six individuals, three of whom, according to the notarial acknowledgements, are husbands of the three others. Extrinsic facts must be resorted to [in order to] determine the identity of the grantors. See Sloss-Sheffield S. I. Co. v. Lollar, 170 Ala. 239, 54 So. 272 (1910). It is also apparent that the document was drafted for execution by an additional, proposed grantor, and the notarial acknowledgment identifies this person as Ruby Lewis. Resort to extrinsic facts establishes that B.A. Lewis had 13 heirs, only three of whom executed the deed; and that none of the grantors inherited any interest in the subject property from B.A. Lewis, and that the interest they inherited was from Victoria Lewis. The evidence further establishes that all of these facts must have been well known to the grantee, J.T. Abston, together with the fact that Lorena, Minnie, Watson and Ruby each owned a one-fourth interest. Although the deed recited a consideration of $200.00, the three heirs who signed the deed (with their spouses) each received $50.00. Further, promptly after the death of Ruby, Abston obtained a deed from her surviving husband. The Court concludes that it was the intention of the parties to the 1927 deed that J.T. Abston acquire only the undivided three-fourths interest owned by Lorena, Minnie, and Watson and that, at the time of the deed, they validly owned such interest, so that he received by the deed the full interest intended by the parties, leaving no room for the application of the after-acquired title doctrine."
We agree with the trial court's initial determination that the 1927 deed is ambiguous on its face. We also agree with the trial court's interpretation of that deed (i.e., that the grantors intended to convey and, in fact, conveyed only the undivided three-fourths interest that they owned). Because the facts surrounding the execution of the 1927 deed, which were examined by the trial court, were undisputed, it was the duty of the court, aided by those attendant facts, to ascertain the intention of the grantors. Henderson v.Noland, 238 Ala. 213, 189 So. 732 (1939); Chambersv. Ringstaff, *Page 116 69 Ala. 140 (1881). We hold, therefore, that the doctrine of estoppel to assert after-acquired title has no application in this case.
 III.
Whether the trial court erred in directing a verdict for the plaintiffs with respect to the affirmative defenses raised by the defendants — adverse possession, laches, and the 20-year rule of repose.
The defendants contend that J.T. Abston and the Abston Defendants divested the plaintiffs of their interest in the property pursuant to either § 6-5-200, Code 1975 (statutory adverse possession), or the common law doctrine of adverse possession by prescription. See Hayden v.Robinson, 472 So.2d 606 (Ala. 1985). The defendants also contend that the plaintiffs' claim of title is foreclosed under the doctrine of laches, see W.T. Smith Lumber Co.v. Barnes, 259 Ala. 164, 66 So.2d 77 (1953), and the 20-year rule of repose or prescription, see Boshell v.Keith, 418 So.2d 89 (Ala. 1982). For the following reasons, we disagree.
Section 35-4-170, Code 1975, reads as follows:
 "No estate or interest of any person can be defeated, discontinued or extinguished by the act of any third person having a possessory or ulterior interest, except in the cases especially provided by this Code."
Section 35-4-270, Code 1975, provides:
 "All warranties by any tenant for life are void as against those in remainder or reversion, and it shall not be necessary for those in remainder or reversion to bring any action or file any complaint to recover such property or set aside or limit such conveyance or declare their interest until they are entitled to such property, and no statute of limitation or repose shall operate against them until such time as they are entitled to such property."
Section 35-4-232, Code 1975, reads as follows:
 "A conveyance made by a tenant for life or years, purporting to convey a greater interest than he possesses or can lawfully convey, does not work a forfeiture of his estate but passes to the grantee all the estate which the tenant could lawfully convey."
The Court in Hammond v. Shipp, 292 Ala. 113, 119,289 So.2d 802, 807-08 (1974), mindful of the provisions of these above quoted Code sections (as embodied in their predecessor sections of the earlier code), observed:
 "Finally, we come to the questions of adverse possession, prescription and laches. The rule is firmly established in this State that until the termination of the life estate the remaindermen have no right of action to recover possession of the land. The statute of limitations never runs against the remaindermen during the existence of the life estate for the reason that no cause or compelling right of action is in them, nor can there be any adverse possession to the remaindermen. Pickett v. Doe, 74 Ala. 122
(1883); Bolen v. Hoven, 143 Ala. 652, 39 So. 379 (1904); Dallas Compress Co. v. Smith, 190 Ala. 423, 67 So. 289 (1914); Bishop v. Johnson, [242 Ala. 551, 7 So.2d 281 (1942)]; Head v. Taylor, 272 Ala. 241, 130 So.2d 4 (1961); Monte v. Montalbano, 274 Ala. 6, 145 So.2d 197
(1963). And, while the remainderman may maintain an action to remove a cloud on his reversion during the pendency of the life estate, he is under no duty to do so and cannot be guilty of laches if he does not do so. Huey v. Brock, 207 Ala. 175, 92 So. 904, cert. denied, 259 U.S. 581, 42 S.Ct. 585, 66 L.Ed. 1074
(1922). The twenty year period of prescription does not begin to run until the death of the life tenant. Huey, supra; Kyser v. McGlinn, [207 Ala. 82, 92 So. 13 (1921)]. Therefore prescription is not applicable in this case."
In our view, Hammond controls the present case.[7] Holford Smith conveyed to *Page 117 
J.T. Abston in 1930 no more than the curtesy interest that he owned at that time. J.T. Abston took by that conveyance an estate for the life of Holford Smith in an undivided one-fourth interest in the property: (i.e., an estate purautre vie). As of the date this appeal was filed, Holford Smith was still alive. Moreover, the undisputed facts show that the use of and improvements made to the property over the years by J.T. Abston and the Abston Defendants were consistent with their ownership of an undivided three-fourths interest in fee and their permissive occupancy as tenants for the life of Holford Smith in an undivided one-fourth interest. See Hayden v. Robinson, supra. Based on the foregoing, we hold that the trial court committed no error in directing a verdict for the plaintiffs with respect to the affirmative defenses raised by the defendants.
The defendants, relying on a number of cases, argue that, under certain circumstances, it is possible for a life tenant to adversely possess against a remainderman. The cases relied on by the defendants do generally stand for the proposition that a widow, retaining possession of property by virtue of her dower or quarantine rights, may acquire title by adverse possession, provided she repudiates the title of her husband and disavows any claim to such title and gives notice of the disavowal, such notice being brought home to the heirs. Those cases are consistent, however, in holding that in order to change a permissive or otherwise nonhostile possession into one that is hostile there must be either actual notice of the hostile claim or acts or declarations of hostility so manifest and notorious that actual notice will be presumed. Ordinary acts of ownership, consistent with permissive possession, are not sufficient to constitute an adverse holding capable of ever ripening into a title. See Marinov. Smith, 454 So.2d 1380 (Ala. 1984); Taylor v.Russell, 369 So.2d 537 (Ala. 1979); White v.Williams, 260 Ala. 182, 69 So.2d 847 (1954); Bank ofColumbia v. McElroy, 231 Ala. 454, 165 So. 105 (1935);Bates v. Flowers, 220 Ala. 205, 124 So. 661 (1929);Bodeker v. Tutwiler, 211 Ala. 537, 100 So. 776
(1924); Hayes v. Lemoine, 156 Ala. 465, 47 So. 97
(1908); Johnson v. Oldham, 126 Ala. 309, 28 So. 487
(1900); Foy v. Wellborn, 112 Ala. 160, 20 So. 604
(1896). See, also, Hayden v. Robinson, supra. In our view, the ordinary acts of ownership, with respect to the property, that J.T. Abston and the Abston Defendants exercised over the years did not constitute an adverse holding capable of ripening into a title.
 IV.
Whether the damages awarded by the trial court were excessive due to the alleged failure of the plaintiffs to mitigate their damages.
The defendants contend that the plaintiffs failed to assert their claim to payment for the extracted oil within a reasonable time after production began at the well. They argue that the plaintiffs are precluded from recovering those damages that could reasonably have been avoided. The thrust of this argument appears to be that the plaintiffs, by not asserting their claim sooner, allowed their damages to appreciate to such an amount that payment of the full damages would now work an extreme hardship on the defendants. (The amount awarded by the trial court, including interest, was in excess of $700,000.)
Estoppel, waiver, and "any other matter constituting an avoidance or affirmative defense," such as mitigation of damages, must be affirmatively pleaded. Rule 8(c), Ala.R.Civ.P. See, also, 5 Wright Miller, FederalPractice and Procedure, § 1273 (1969). Our review of the record and briefs indicates that the defendants did not assert *Page 118 
mitigation of damages as a defense in their answer to the plaintiffs' complaint or at any time during the trial. The defendants did raise this issue, and the plaintiffs briefly responded to it, after the trial court had directed a verdict for the plaintiffs. We note, however, that the evidence relied on by the defendants in support of their "mitigation" argument was sufficiently within the proof of the issues properly before the court to preclude the operation of Rule 15(b), Ala.R.Civ.P. See, Osborne Truck Lines, Inc. v.Langston, 454 So.2d 1317 (Ala. 1984); MetropolitanLife Ins. Co. v. Sullen, 413 So.2d 1106 (Ala. 1982). We, therefore, decline to consider the defendants' argument.Seier v. Peek, 456 So.2d 1079 (Ala. 1984). We also note that § 19-3-278, Code 1975, cited by the defendants, has no application under the facts of this case.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, ALMON and BEATTY, JJ., concur.
[2] Numerous plaintiffs joined Susie T. Lewis in bringing the lawsuit. These plaintiffs, and their respective interests in the case, are sufficiently identified later in this opinion; therefore, we pretermit identifying them all by name.
[3] Numerous defendants were named in the lawsuit in addition to Harkins Company, Inc. These defendants are sufficiently identified later in this opinion; therefore, we pretermit identifying them all by name.
[4] At the time of trial, Mr. Utsey represented Harkins, as well as the other Working Interest Defendants. The record indicates, however, that he did not represent the Abston Defendants.
[5] This conversion claim was later dismissed by the plaintiffs just prior to Mr. Utsey's testimony.
[6] The defendants assert in their brief that Mr. Utsey's disqualification worked a substantial hardship on them because of his familiarity with the case; however, the record reflects that, prior to trial, additional counsel was associated by the Working Interest Defendants in anticipation that Mr. Utsey might have to withdraw from the case during trial and that no effort was made after Mr. Utsey's disqualification to seek a continuance.
[7] We note that J.T. Abston became a tenant in common with Ruby Lewis following the execution of the 1927 deed. There is no evidence in the record, however, tending to show that J.T. Abston's possession of the property ever became adverse to his cotenant prior to her death. See Hayden v.Robinson, supra. In fact, the execution of the 1930 deed seems to negate any inference that J.T. Abston considered his possession adverse as against Ruby. Therefore, we are not faced with a situation where possession has become adverse prior to subsequent disabilities arising (i.e., the creation of a life estate in J.T. Abston). See Kubiszyn v.Bradley, 292 Ala. 570, 298 So.2d 9 (1974); Kidd v.Browne, 200 Ala. 299, 76 So. 65 (1917).