[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1141 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1142 
 Introduction
The petitioners now before us, Annie Jean Helms, Mary Jon Brown, Sharon Wallace, Susan Grimes Mitchum, and Robert Grimes (hereinafter, sometimes collectively "the contestants") contested a will in the trial court, where the jury returned a verdict and the trial court entered a judgment in favor of the contestants and thereby invalidated the contested will. The respondents now before us, Ruth H. Morrow and Pamela Morrow (hereinafter, sometimes collectively "the proponents") had offered the will for probate and, after they lost the will contest to the contestants in the trial court, appealed the adverse judgment to this Court, which, pursuant to § 12-2-7(6), Ala. Code 1975, deflected the appeal to the Court of Civil Appeals, which reversed the judgment of the trial court, remanded the case, and instructed the trial court to enter a judgment in favor of the proponents, so that they could proceed to effectuate the will and to receive its benefits. Morrow v. Helms, [Ms. 2990942, March 16, 2001] 873 So.2d 1132 (Ala.Civ.App. 2001).
The contestants have petitioned us for a writ of certiorari, which we have granted, to review the judgment of the Court of Civil Appeals. While we agree that the trial court committed one error, we do not agree that it committed two more as held by the Court of Civil Appeals. The one error committed by the trial court entitles the proponents to a reversal of the trial court judgment and to a new trial, but not to the judgment as a matter of law contemplated *Page 1143 
by the Court of Civil Appeals. Therefore, we affirm in part, reverse in part, and remand to the Court of Civil Appeals for further proceedings.
In the appeal decided by the Court of Civil Appeals, the proponents of the contested will, the appellants before the Court of Civil Appeals, contended that the trial court had committed three reversible errors in, first, denying the proponents' motion for judgment as a matter of law on their claim that the execution of the will met the formal requirements for validity; second, denying the proponents' motion for judgment as a matter of law on the contestants' claim that the decedent, Bernice H. Grimes, lacked testamentary capacity; and, third, denying the proponents' motion for judgment as a matter of law on the contestants' claim that the proponents had procured the will by exerting undue influence on Bernice. The Court of Civil Appeals held that the trial court committed all three errors. We are reviewing all three of these holdings by the Court of Civil Appeals and therefore necessarily are reviewing all three of the challenged rulings by the trial court.
 Standard of Review
"On certiorari review, this Court accords no presumption of correctness to the legal conclusions of the intermediate appellate court. Therefore, we must apply de novo the standard of review that was applicable in the Court of Civil Appeals." Ex parte Toyota Motor Corp., 684 So.2d 132, 135
(Ala. 1996). The appellate standard for reviewing a ruling on a motion for judgment as a matter of law, a "JML," is the same as the standard for the original decision by the trial court. Palm Harbor Homes, Inc. v.Crawford, 689 So.2d 3 (Ala. 1997).
The first prerequisite for JML in favor of a movant who asserts a claim or an affirmative defense is that the claim or affirmative defense be valid in legal theory, if its validity be challenged. See Driver v.National Sec. Fire Cas. Co., 658 So.2d 390 (Ala. 1995). The second prerequisite for JML in favor of such a movant, who necessarily bears the burden of proof, American Furniture Galleries v. McWane, Inc.,477 So.2d 369 (Ala. 1985), McKerley v. Etowah-DeKalb-Cherokee MentalHealth Board, Inc., 686 So.2d 1194 (Ala.Civ.App. 1996), and Oliver v.Hayes International Corp., 456 So.2d 802 (Ala.Civ.App. 1984), is that each contested element of the claim or affirmative defense be supported by substantial evidence. See Driver, supra, and McKerley, supra. The third prerequisite for JML in favor of such a movant is that the record be devoid of substantial evidence rebutting the movant's evidence on any essential element of the claim or affirmative defense. See Driver,supra, and First Fin. Ins. Co. v. Tillery, 626 So.2d 1252 (Ala. 1993). Substantial rebutting evidence would create an issue of fact to be tried by the finder of fact and therefore would preclude JML. See Driver,supra, and First Financial, supra. JML in favor of the party who asserts
the claim or affirmative defense is not appropriate unless all three of these prerequisites coexist. See Driver, supra, and First Financial,supra, McKerley, supra, and Oliver, supra.
JML in favor of a movant who does not assert the claim or affirmative defense but who only opposes it, and who therefore does not bear the burden of proof, is appropriate in either of two alternative cases. One is that the claim or affirmative defense is invalid in legal theory. SeeHarkins Co. v. Lewis, 535 So.2d 104 (Ala. 1988). The other is that one or more contested essential elements of the claim or affirmative defenses is unsupported by substantial evidence. See Banks v. Harbin,500 So.2d 1027 (Ala. 1986), and *Page 1144 McKerley, supra. If either alternative be true, JML is appropriate. See Harkins, supra, Banks, supra, andMcKerley, supra. If, however, the nonmovant's claim or affirmative defense is valid in legal theory and is supported by substantial evidence on every contested element, JML is inappropriate irrespective of the presence or weight of countervailing evidence. See Driver, supra, andFirst Financial, supra.
The statutory definition of substantial evidence is: "evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions as to the existence of the fact sought to be proven." § 12-21-12(d), Ala. Code 1975. West v. Founders Life Assurance Co. of Florida, 547 So.2d 870,871 (Ala. 1989), explains, "substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." A trial court deciding a motion for JML and an appellate court reviewing such a ruling must accept the tendencies of the evidence most favorable to the nonmovant, Wal-Mart Stores, Inc. v. Manning, 788 So.2d 116
(Ala. 2000), Southern Energy Homes, Inc. v. Washington, 774 So.2d 505
(Ala. 2000), and Palm Harbor Homes, supra, and must resolve all reasonable factual doubts in favor of the nonmovant, Willis v. Parker,814 So.2d 857 (Ala. 2001).
 The Formal Validity of the Execution of the Will
The proponents advanced two arguments before the Court of Civil Appeals in support of the proponents' claim that the trial court erred in denying the proponents' motion for JML on the issue of the formal validity of the execution of the will. The first argument was that the will was "self-proved" pursuant to § 43-8-132, Ala. Code 1975, even though the official seal of the "officer authorized to administer oaths" was not affixed as required by this statute. The Court of Civil Appeals agreed that the seal was unnecessary and that the will was self-proved. We must reject these holdings, because the statute means what it says. Judge Murdock, in his special writing in this case below, correctly explains the indispensable nature of the seal, Morrow, 873 So.2d at 1137 (Murdock, J., concurring in the result), and we adopt Judge Murdock's analysis.
The proponents' second argument is that they introduced uncontradicted evidence that the will was actually executed as required by § 43-8-131, Ala. Code 1975 — that is, that the will was signed by the testator before two witnesses, who also signed. We agree. Judge Murdock's special writing correctly analyzes this issue too. Morrow, 873 So.2d at 1138 (Murdock, J., concurring in the result).
The contestants did not preserve any challenge to the legal sufficiency of the proponents' prima facie proof of the formalities of the execution of the will, and no evidence in the record rebuts the proponents' prima facie proof. Therefore, the trial court erred in denying the proponents' motion for JML on this issue and in submitting this issue to the jury.
The jury returned a general verdict, which reads:
 "We, the Jury, find the issues in favor of the Contestants, Annie Jean Helms, Mary Jon Brown, Sharon Wallace, Susan Mitch[u]m. and Robert Grimes and that the purported will offered in evidence is not the valid last will and testament of Bernice H. Grimes, deceased."
The text of this verdict against the proponents of the will does not exclude the possibility that the jury based the verdict on a finding that Bernice did not sign the *Page 1145 
will or that she did not sign it before two witnesses who also signed, as required by § 43-8-131. Such a finding would be contrary to the proponents' uncontroverted prima facie proof. Thus, the error of the trial court in denying JML in favor of the proponents on this issue requires reversal. See Aspinwall v. Gowens,405 So.2d 134 (Ala. 1981). The judgment of the Court of Civil Appeals is correct to this extent, although for a wrong reason.
 Substantive Facts Pertinent to the Issues of Testamentary Capacity and Undue Influence
An analysis of the second and third issues is necessarily fact intensive. Because, in reviewing the decision of the Court of Civil Appeals on a trial court ruling on a motion for JML, we must accept the tendencies of the evidence most favorable to the nonmovants, the contestants, Manning, supra, Washington, supra, and Palm Harbor Homes,supra, and must resolve all reasonable factual doubts in favor of the nonmovant, Willis, supra, we will so discuss the evidence and the facts.
The putative testatrix of the second will was Bernice H. Grimes. The proponents are Bernice's sister Ruth Morrow and Ruth's daughter Pam Morrow. The four contestants are blood nieces and a blood nephew of Bernice's late husband John Grimes. The four contestants are related to Bernice only by her marriage to John, the contestants' uncle.
In 1994 Bernice executed a will which would have left substantial property to the contestants, although more to the proponents, if Bernice's husband John, then living, were to predecease her. In May 1996 John died of cancer, which had caused him lingering agony, which, in turn, had caused Bernice acute grief. At John's death, Bernice inherited 17 certificates of deposit ("CDs") jointly titled in the names of John and Bernice, with right of survivorship. Beginning within a month after John's death and continuing until Bernice's death in 1998, as each C.D. was renewed at maturity, the proponents' names, along with Bernice's name, appeared on each C.D. as joint owners with right of survivorship. These CDs totaled $215,743.95 in value, which the proponents owned jointly after Bernice's death. After John's death, proponent Pamela opened a joint checking account in the names of Bernice, Pamela, and Ruth, with right of survivorship, and deposited only Bernice's money in the account. Statements for this joint checking account were mailed only to proponent Ruth's home address. Before John's death, the proponents had already acquired joint ownership, with survivorship, of, and check-writing authority on, one of Bernice's then-existing checking accounts, which, at Bernice's death, was worth $13,941, then owned jointly by the proponents. Likewise, before John's death, both proponents had already acquired a key and access to Bernice's safe deposit box, even though, in the will-contest litigation, Ruth denied that she had such access.
In December 1996 Bernice began experiencing pain in her side. On December 30, 1996, she visited Dr. William Reynolds, whom the proponents had recommended. Dr. Reynolds prescribed Lortab, consisting of hydrocodone, a synthetic morphine-like narcotic, for Bernice's pain and referred Bernice to a specialist for diagnosis. That evening, after his regular working hours, Dr. Reynolds called Bernice at home because he was so worried about her pain and her mental state.
Four days later, on January 3, 1997, Bernice returned to Dr. Reynolds, who told her she was dying of the same sort of cancer that had killed her husband. On this visit, Dr. Reynolds prescribed more *Page 1146 
Lortab in a greater dosage and advised Bernice "that [her] family situation needs to be put in order." On January 20, 1997, Dr. Reynolds prescribed still more Lortab requested by Bernice.
On January 15, 1997, Bernice purported to execute a second will, the one at issue in this case, at the office of Jackson W. Stokes, the lawyer who had drafted this putative second will, not the same lawyer who had drafted Bernice's first will in 1994. The January 15, 1997 will, Bernice's putative second will, in the words of the Court of Civil Appeals, "practically disinherited all of the contestants and left almost all her estate to the proponents." Morrow, 873 So.2d at 1135.
The proponent Pamela had recommended Mr. Stokes to Bernice for this putative second will. During the weeks preceding January 15, 1997, Bernice had been dependent on the proponents to drive her wherever she needed to go. Even though, during the will-contest litigation, the proponents denied even knowing about the second will until months after Bernice's death, proponent Ruth told one of the contestants, on the day after Bernice's funeral, that the proponents could take whatever they wanted from Bernice's house because the proponents were inheriting all of it.
Beginning when Bernice started to take Lortab and continuing after she purported to execute the second will, she was always asleep or sleepy. Dr. Reynolds testified that Lortab "alters your mind . . .[,] affects your thinking," "can make you nauseous," "can make you generally poor in health," "can cause problems to interfere with your ability to think clearly," and makes a person "sedated and confused." Dr. Reynolds testified further that, because of the sedating effect of Lortab, a physician who prescribes Lortab tells a patient "don't you drive, don't you get on a forklift, don't you go up on heights." (Emphasis added.) Dr. Reynolds testified that Bernice's pain and her medication affected "her mental state, her mental ability to be cognitive and clear."
Kathy M. Bozeman, a registered nurse, testified that she was familiar with the drug Lortab and its effects. She testified that Lortab affects a person's central nervous system, "the system that makes you drowsy and changes your moods." "[W]hen someone has cancer, [the doctors] start [him or her] with a low level of pain medicine . . . [a]nd then [he or she] graduate[s] up to higher, more strong medicine . . . because [his or her] body . . . adjust[s] to that first [dosage]" "in a month or so." Bozeman testified that Lortab normally affects a person's mind — that Lortab can cause a patient to lose the ability to concentrate or to lose the ability to know what he or she is doing.
Bozeman stated that, if, during the first month Bernice was taking Lortab, she "was sleeping, staying asleep, was always drowsy, and not aware as she used to be," Bernice's condition was consistent with the side effects of Lortab. She stated that, assuming Dr. Reynolds "saw Bernice on January 3, 1997 and he told her that she had the same kind of cancer that [killed] her husband," Bernice's cancer "would [have been] difficult and emotional news" for Bernice. Bozeman stated that, if Bernice "on January 15, 1997, signed a will and was taking Lortab, she would be doing so with the propensity of that medication affecting her."
The evidence tended to prove that proponent Ruth visited Bernice at her home daily from the time she started to take Lortab through the date she purported to execute the putative second will. The record contains evidence that, on several occasions during this period, proponent Ruth denied others access to Bernice. *Page 1147 
 Testamentary Capacity
At trial the contestants sought to prove their claim that Bernice was mentally incompetent to execute the contested will when the proponents claimed she executed it, January 15, 1997. At the close of the contestants' evidence and at the close of all the evidence, the proponents moved for JML on this claim by the contestants. On appeal, the Court of Civil Appeals agreed with the proponents' argument that the trial court erred to reversal in denying JML in favor of the proponents on this claim by the contestants. We disagree, because the record contains substantial evidence supporting this claim of the contestants, the nonmovants.
 "The law presumes that every person has the capacity to execute a will, and the burden is on the contestant to prove the lack of testamentary capacity. To possess testamentary capacity, one must be able to recall the property to be devised, the desired disposition of the property, and the persons to whom he or she wishes to devise the property. In Fletcher v. DeLoach, 360 So.2d 316
(Ala. 1978), the Court described in detail the broad evidentiary inquiry that must be made when testamentary capacity is at issue:
 "'"Evidence is competent to prove conduct and language at various times and places indicating an unhealthy mental condition, and the more extensive the view the safer is the determination reached."
 "'[Tucker v. Tucker, 248 Ala. 602, 610, 28 So.2d 637, 644 (1946).] Thus, evidence offered as to the mental and physical condition of the testatrix, either before or immediately after execution of the will, is admissible since it tends to indicate her condition when the will was signed. Likewise, testimony regarding the testatrix's "conversations, deportment, acts, and appearance" has been found to be competent on the issue of testamentary capacity.'
"360 So.2d at 318 (citations omitted)."
Allen v. Sconyers, 669 So.2d 113, 117-18 (Ala. 1995) (citations omitted and emphasis added).
 "Simply stated, if the testator knows his estate and to whom he wishes to give his property and understands that he is executing a will, he has testamentary capacity. A person may execute a valid will, even if he or she is not competent to transact ordinary, everyday affairs.
". . . .
 "'The fact that the testator is under the immediate influence of intoxicating liquor or drugs at the time he performs the testamentary act does not invalidate his will on the ground of lack of testamentary capacity, provided that he then comprehends the nature, extent, and disposition of his estate and his relation to those who have or might have a claim on his bounty . . . .'"
Smith v. Vice, 641 So.2d 785, 786-88 (Ala. 1994) (citations omitted). Neither the proponents nor the contestants have presented direct testimony to the particulars of Bernice's testamentary capacity — whether she recalled or comprehended the property to be given, the identities and relations of the beneficiaries, or the fact or significance of executing a will. The contestants are not confronted with uncontradicted adverse testimony on these critical particulars. Rather, both sides rely on circumstantial evidence.
While the record does not contain direct evidence that Bernice actually ingested Lortab on January 15, 1997, the date of the putative second will, the evidence of Bernice's consumption of Lortab *Page 1148 
both before and after that date, the evidence of the effects and side effects of Lortab, and the evidence of Bernice's physical pain and mental distress is sufficient to rebut the legal presumption in favor of Bernice's testamentary capacity and to create a genuine issue of fact to be decided by the finder of fact. Allen, supra. While the conclusory testimony of the proponents' witnesses to the effect that Bernice appeared to be "of sound mind" does tend to rebut the contestants' evidence, such countervailing evidence does not eliminate the issue of fact and does not warrant or allow JML. See Jim Walter Homes, Inc. v. Kendrick, 810 So.2d 645
(Ala. 2001), Washington, supra, and A.T. Stephens Enters., Inc. v.Johns, 757 So.2d 416 (Ala. 2000). Therefore, the Court of Civil Appeals erred in holding that the trial court erred in denying the proponents' motion for JML on this issue.
 Undue Influence
At trial the contestants sought to prove also that the proponents procured the putative January 15, 1997 will by exerting undue influence in Bernice. At the close of the contestants' evidence and at the close of all the evidence, the proponents moved for JML on this claim by the contestants too. On appeal, the Court of Civil Appeals agreed with the proponents' argument that the trial court erred to reversal in denying JML in favor of the proponents on this claim by the contestants. We disagree, because the record contains substantial evidence supporting the two elements of a claim of undue influence that the Court of Civil Appeals held unsupported by substantial evidence.
 "To establish a prima facie case of undue influence, the contestant must show that a confidential relationship existed between a favored beneficiary and the testator; that the beneficiary's influence was dominant and controlling in the relationship; and that there was undue activity on the part of the dominant party in procuring the execution of the will. A confidential relationship arises when one comes to rely upon and trust another in one's important affairs. The term `favored beneficiary' has been defined as:
 "'One who, in the circumstances of the particular case, has been favored over others having equal claim to the testator's bounty. An unnatural discrimination, leading to a natural inference that advantage has been taken by one in position so to do; and shown to have been busy in getting such will executed.'
 "Cook v. Morton, 241 Ala. 188, 192, 1 So.2d 890, 892
(1941). Whether the beneficiary was the dominant party in the relationship is usually a question of fact for the jury, and the jury may review the often circumstantial evidence as to whether there were controlling influences over the testator's behavior. Undue activity in the procurement or execution of a will may also be proved by circumstantial evidence."
Allen, 669 So.2d at 117 (citations omitted and emphasis added). The Court of Civil Appeals addressed only two of the essential elements of a claim of undue influence: the proponents' alleged dominance and control over Bernice and the proponents' alleged undue activity in procuring the execution of the will. The Court of Civil Appeals held that the record contains "no evidence" supporting either of these elements. We disagree.
The evidence of the proponents' access to and control over Bernice's money and property, their profiting from this access and control during Bernice's last two years of life and soon after Bernice's death, their control over Bernice's *Page 1149 
transportation, and their control, to some extent, of access to Bernice herself during the 16 critical days culminating with the execution of the putative second will constitutes substantial evidence of dominance and control. The same evidence that the proponents obtained money and property from Bernice, the evidence that proponent Pamela suggested the lawyer who drafted the second will, the evidence that one of the proponents must have driven Bernice to the office where the will was executed, and the evidence that both proponents falsely denied any knowledge of the second will is substantial evidence of undue activity in procuring the execution of the will.
Therefore, the Court of Civil Appeals erred in holding that the trial court erred in denying the proponents' motion for JML in what the Court of Civil Appeals erroneously held to be an absence of substantial evidence to support these two essential elements of the contestants' claim of undue influence. While the proponents also argue to us that athird essential element of this claim, the element that the proponents were "favored beneficiaries" under the putative 1997 second will, is unsupported by substantial evidence, the Court of Civil Appeals did not address this essential element; and, because no holding by the Court of Civil Appeals on this element is before us, we will not address it either. Our remand will not foreclose consideration of this issue.
 Conclusion
While the trial court erred in denying the proponents a JML on their claim that the formalities of the execution of the will satisfied statutory requirements, the trial court did not err in denying the proponents a JML on the contestants' claim of lack of testamentary capacity in Bernice and did not err in denying the proponents a JML on the contestants' claim of the proponents' undue influence over Bernice. Thus, the Court of Civil Appeals erred in its holdings that the trial court erred in denying the proponents' motion for JML on each of these two claims by the contestants. Therefore, even though the judgment of the trial court must be reversed, these errors by the Court of Civil Appeals invalidate its proposed instruction for the trial court "to enter a judgment for the proponents."
The contestants are entitled to proceed again to the jury on their lack-of-testamentary-capacity claim; and, absent further consideration and an adverse holding by the Court of Civil Appeals on the issue of the proponents' status as "favored beneficiaries" under the putative 1997 second will, the contestants will be entitled to proceed again to the jury on their undue-influence claim. Therefore, this cause must be affirmed in part, reversed in part, and remanded to the Court of Civil Appeals for proceedings not inconsistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
MOORE, C.J., and HOUSTON, LYONS, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.
SEE, J., concurs in part and dissents in part.