SMITH, Justice.
 

 Etole C. Furrow is the proponent of a will her mother, Jewell B. Malone, executed in 2003. Gregory Helton is a grandson of Malone who contested the 2003 will. After a trial before the Mobile County Probate Court, a jury returned a verdict in favor of Gregory, and Furrow appeals from a judgment entered on that verdict. We reverse and remand.
 

 Facts and Procedural History
 

 Malone, a resident of Mobile County, had three daughters: Furrow; Sarah C. Lott; and Dorothy June C. Helton, who was Gregory’s mother. Malone had grandchildren by each daughter.
 

 Malone executed a will in 1995 devising her estate to her three daughters in equal shares. If a daughter predeceased Malone, that daughter’s share under the 1995 will would pass to the daughter’s children per stirpes. The 1995 will named Furrow as the executrix of Malone’s estate; in the event Furrow could not serve, Lott and Helton were to be co-executrixes.
 

 After a protracted illness, Malone’s daughter Helton died on November 30, 2003. Malone executed a new will on December 16, 2003, devising her estate equally between Furrow and Lott, Malone’s two remaining living daughters. The 2003 will made no provision for any of Malone’s grandchildren; instead, it provided that if either Furrow or Lott preceded Malone in death, the surviving daughter would receive Malone’s entire estate. The 2003 will named Furrow as the executrix or, alternatively, Lott, if Furrow could not serve.
 

 Malone died on June 20, 2006. Furrow sought to have the 2003 will probated in the Mobile County Probate Court, and Gregory filed a will contest alleging, among other things, that the 2003 will was the result of Furrow’s undue influence.
 

 The will contest was tried before a jury. Before the matter was submitted to the jury at the conclusion of the trial, the probate court entered a judgment as a matter of law (“JML”) against Gregory on all claims except the claim alleging that Furrow had exercised undue influence over Malone regarding the 2003 will. The jury returned a verdict in Gregory’s favor on his claim of undue influence, and the probate court entered a judgment on the verdict in favor of Gregory and against the 2003 will. Furrow filed a renewed motion for a JML under Rule 50(b), Ala. R. Civ. P., which the trial court later denied. Furrow appealed to this Court.
 
 See
 
 § 12-22-21, Ala.Code 1975 (authorizing an appeal to this Court from an order, judgment, or decree of the probate court “on a contest as to the validity of a will”).
 

 Discussion
 

 Furrow contends she was entitled to a JML as to Gregory’s claim that the 2003 will was the result of Furrow’s allegedly exercising undue influence over Malone.
 

 
 *353
 
 “ ‘When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Regarding questions of fact, the ultimate question is whether the non-movant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling.’ ”
 

 City of Birmingham v. Brown,
 
 969 So.2d 910, 915 (Ala.2007) (quoting
 
 Waddell & Reed, Inc. v. United Investors Life Ins. Co.,
 
 875 So.2d 1143, 1152 (Ala.2003)).
 

 Gregory, as the contestant, had the burden at trial of proving the elements of undue influence.
 
 Clifton v. Clifton,
 
 529 So.2d 980, 983 (Ala.1988) (“It is well established that the contestant who challenges a will on the basis of undue influence bears the burden of proving such allegations.” (citing
 
 Kelly v. Donaldson,
 
 456 So.2d 30, 33 (Ala.1984))). As the proponent of the will, Furrow opposed Gregory’s claim of undue influence; therefore, the following is relevant to our review of the trial court’s denial of Furrow’s motion for a JML:
 

 “JML in favor of a movant who does
 
 not
 
 assert the claim or affirmative defense but who only opposes it, and who therefore does not bear the burden of proof, is appropriate in either of two alternative cases. One is that the claim or affirmative defense is invalid in legal theory.
 
 See Harkins & Co. v. Lewis,
 
 535 So.2d 104 (Ala.1988). The other is that one or more contested essential elements of the claim or affirmative defenses is unsupported by substantial evidence.
 
 See Banks v. Harbin,
 
 500 So.2d 1027 (Ala.1986), and
 
 McKerley [v. Etowah-DeKalb-Cherokee Mental Health Bd., Inc.,
 
 686 So.2d 1194 (Ala.Civ.App. 1996)]. If either alternative be true, JML is appropriate.
 
 See Harkins, supra, Banks, supra,
 
 and
 
 McKerley, supra.
 
 If, however, the nonmovant’s claim or affirmative defense is valid in legal theory and is supported by substantial evidence on every contested element, JML is inappropriate irrespective of the presence or weight of countervailing evidence.
 
 See Driver [v. National Sec. Fire & Cas. Co.,
 
 658 So.2d 390 (Ala. 1995) ], and
 
 First Financial [Ins. Co. v. Tillery,
 
 626 So.2d 1252 (Ala.1993) ].”
 

 Ex parte Helms,
 
 873 So.2d 1139, 1143-44 (Ala.2003).
 

 Furrow contends that the second scenario described in
 
 Helms
 
 applies in the present case, i.e., “that one or more contested essential elements of the claim or affirmative defenses is unsupported by substantial evidence.” 873 So.2d at 1143. Furrow argues that the burden of proof never shifted to her and that the trial court erred in denying her motion for a JML on the undue-influence claim. We agree.
 

 As the contestant, Gregory was required to offer substantial evidence showing
 

 “(1) that a confidential relationship existed between a favored beneficiary and the testator; (2) that the influence of or for the beneficiary was dominant and
 
 *354
 
 controlling in that relationship; and (3) that there was undue activity on the part of the dominant party in procuring the execution of the will.”
 

 Clifton,
 
 529 So.2d at 983 (citing
 
 Penn v. Jarrett,
 
 447 So.2d 723, 724 (Ala.1984);
 
 Reed v. Walters,
 
 396 So.2d 83, 86 (Ala. 1981)).
 
 See also Hubbard v. Moseley,
 
 261 Ala. 683, 686-87, 75 So.2d 658, 661 (1954).
 

 In the present case, Gregory failed to offer substantial evidence suggesting that Furrow exercised a dominant or controlling influence over Malone or that Furrow engaged in undue activity in procuring the execution of the will. Thus, Gregory failed to meet his burden of proof on at least two of the three elements of his undue-influence claim.
 
 [1]
 

 The presumption is that the parent (Malone) was dominant over the child (Furrow).
 
 Clifton,
 
 529 So.2d at 984 (citing
 
 Nottage v. Jones,
 
 388 So.2d 923, 926 (Ala. 1980) (where the party in a will contest alleged to have exerted undue influence over the testatrix is the child of the testatrix, it is ordinarily presumed that the parent is dominant over the child)). Thus, Gregory had the burden of offering substantial evidence to the contrary.
 
 Wilson v. Wehunt,
 
 631 So.2d 991, 993-94 (Ala. 1994).
 
 See also Clifton,
 
 529 So.2d at 983-84.
 

 Gregory correctly notes that the issue of dominance may be proved by circumstantial evidence.
 
 See Ex parte Helms,
 
 873 So.2d at 1148;
 
 Allen v. Sconyers,
 
 669 So.2d 113, 118 (Ala.1995). However, the circumstantial evidence offered to show dominance must nevertheless be
 
 substantial
 
 evidence.
 
 See, e.g., Wilson,
 
 631 So.2d at 993-94. “Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989).
 
 See also
 
 § 12-21-12(d), Ala.Code 1975.
 

 Gregory contends that “the jury accepted the testimony of [Gregory], [Gregory’s father, Winfred Helton, Sr.], and [Gregory’s brother, Winfred Helton, Jr. (‘Bubba’) ], that [Malone] was feeble, hallucinating, and vulnerable” around the time she executed the 2003 will.
 
 [2]
 
 Bubba testified that Malone “probably took over 10 pills a day” in the two- to three-year period before June Helton died in November 2003. He testified that “on a few occasions” he saw her take the medication Haldol, which he testified his ex-wife thought was for the treatment of Alzheimer’s disease.
 
 [3]
 

 
 *355
 
 Gregory also argues that the jury rejected most of or all Furrow’s testimony because, he says, the jury found it lacking in credibility. He contends that the jury’s rejection of Furrow’s testimony and the jury’s acceptance of his testimony and the testimony of Winfred, Sr., and Bubba “was in and of itself [substantial evidence from which] the jury could have inferred [Furrow] was dominant in her exercise of a confidential relationship at the time the contested will was procured.” Gregory contends, therefore, that the facts in the present case present a jury question on the issue of undue influence as did the facts in
 
 Ex parte Helms, supra,
 
 in which this Court held that a summary judgment was improper on an undue-influence claim. 873 So.2d at 1148-49.
 

 In
 
 Ex parte Helms,
 
 this Court found that the contestants had presented substantial evidence of dominance and control and undue activity in procuring the execution of the will being contested. The testator in
 
 Ex parte Helms
 
 executed a second will in 1997, approximately 12 days after her doctor informed her that she was dying of cancer and “that [her] family situation need[ed] to be put in order.” The second will “ ‘practically disinherited all of the contestants and left almost all her estate to the proponents.’ ” 873 So.2d at 1146 (quoting
 
 Morrow v. Helms,
 
 873 So.2d 1132, 1135 (Ala.Civ.App.2001)). Under the testator’s prior will, the contestants would have inherited “substantial property.” 873 So.2d at 1145.
 

 The evidence showed that the testator in
 
 Ex parte Helms
 
 was taking the medication Lortab
 
 [4]
 
 for pain on a regular basis both before and after the date of the execution of the second will. 873 So.2d at 1145, 1147-48. There was extensive medical testimony regarding the side effects of Lortab; specifically, there was testimony that Lortab alters the mind, affects thinking, interferes with the ability to think clearly, “makes a person ‘sedated and confused,’ ” affects the central nervous system, causes drowsiness, and can cause a person “to lose the ability to know what he or she is doing.” 873 So.2d at 1146. Further, there was evidence suggesting that the testator in
 
 Ex parte Helms
 
 experienced many of those side effects.
 

 This Court held that there was substantial evidence of the proponents’ dominance and control in
 

 “[t]he evidence of the proponents’ access to and control over [the testator’s] money and property, their profiting from this access and control during [the testator’s] last two years of life and soon after [her] death, their control over [her] transportation, and their control, to some extent, of access to [the testator] during the 16 critical days culminating with the execution of the putative second will.”
 

 
 *356
 
 873 So.2d at 1148-49. Additionally, this Court in
 
 Ex parte Helms
 
 held that the substantial evidence of the proponents’ undue activity in the procurement of the will included the following:
 

 — During the last two years of the testator’s life, the proponents obtained joint ownership with right of survivor-ship to certificates of deposit totaling $215,743.95 in value;
 

 — One of the proponents opened a joint checking account in the names of the testator and the proponents with right of survivorship and deposited only the testator’s money in the account, and the statements for the account were mailed only to the address of one of the proponents;
 

 — Both proponents had a key and access to the testator’s safe-deposit box, although one of the proponents had denied during the will-contest litigation that she had such access;
 

 — One of the proponents suggested the lawyer who drafted the second will, and that lawyer was not the same lawyer who drafted the testator’s first will;
 

 — During the weeks preceding her death, the testator was dependent on the proponents for all of her transportation, and one of the proponents must have driven her to the lawyer’s office to execute the second will; and
 

 — “[B]oth proponents falsely denied any knowledge of the second will.”
 

 873 So.2d at 1145-46, 1148-49.
 

 Furrow contends, however, that the facts here are more analogous to
 
 Wilson, supra,
 
 in which this Court examined a claim that a son had exerted undue influence over his mother in procuring a deed conveying property to the son. In
 
 Wilson,
 
 the son who was alleged to have exerted undue influence argued to this Court that the grandchildren seeking to cancel the deed had not offered sufficient evidence showing that he had exercised dominance over his mother. 631 So.2d at 995. In agreeing with the son, this Court considered the evidence that the son had provided his mother with financial assistance and assistance in handling her affairs, had provided transportation, had assisted her in writing her checks, and had arranged to have the deed in question prepared and her signature notarized. 631 So.2d at 994. This Court concluded that “evidence of this nature, without more, is simply not sufficient to justify a finding of subservience on the part of the parent, so as to create a legal presumption of undue influence.” 631 So.2d at 994. As to the proof necessary to overcome the presumption that a parent is dominant over a child, this Court stated:
 

 “It is well settled that one alleging dominance of a child over a parent must prove that ‘time and circumstances have reversed the order of nature, so that the dominion of the parent has not merely ceased, but has been
 
 displaced,
 
 by subservience to the child.’
 
 Hawthorne v. Jenkins,
 
 182 Ala. 255, 260, 62 So. 505, 506 (1913) (emphasis in original). ‘Subservient’ is defined in
 
 The American Heritage Dictionary of the English Language
 
 (1969) as ‘[ujseful as a means or instrument; serving to promote some end ... [; subordinate in capacity or function.’
 
 Black’s Law Dictionary
 
 486 (6th ed.1990) defines ‘dominate’ as ‘[t]o master, to rule, or to control.’ Thus, for the burden of proof to shift, it is clear that our cases require proof of more than a reversal of the traditional roles of parent as care giver and child as care recipient; they require proof that the parent’s will has become subordinate to the will of the child. It is also clear from our cases that the mere relationship of parent and child alone, even
 
 *357
 
 when coupled with some activity on the part of the child in securing the preparation of legal papers for the parent, is not sufficient to prove subservience on the part of the parent, so as to shift to the child the burden of proving an absence of undue influence. See, e.g.,
 
 Keeble v. Underwood,
 
 193 Ala. 582, 586-87, 69 So. 473, 475 (1915), a will contest case wherein this Court noted:
 

 “ ‘It is now well settled that where a donee occupies to the donor a position of trust and confidence, such as that between a beneficiary occupying a confidential relation and the testatrix, and such donee or beneficiary takes part or exercises some activity in the preparation or in the procurement of the execution of the will, the burden of proof is shifted to the beneficiary to show that the contested instrument was not superinduced by undue influence.
 
 Scarbrough v. Scarbrough,
 
 185 Ala. 468, 64 So. 105 [1913];
 
 Bancroft v. Otis,
 
 91 Ala. 279, 8 So. 286, 24 Am. St. Rep. 904 [1890]. This is the general rule. However, while the relationship of parent and child is per se confidential, yet it is well settled that it is always presumed prima facie that in all transactions between them the parent is the dominant party and that such are free from undue influence.
 
 The mere relationship alone, coupled with activity on the part of the child in seeming the preparation of the will, is not sufficient, under the authorities, to shift the burden of proof upon the child in cases of gift by the parent, as we hold that, prima facie, the parent is the dominant spirit in the transaction, and gifts flow naturally from parent to child.
 
 One of the foundations of the rule as to presumption of undue influence is the theory that the donor is the weaker party.
 
 While the relation of parent and child is per se confidential, yet in view of the presumption, recognized in this state and abundantly supported by authorities elsewhere, that the parent is the dominant spirit, the burden of proof is not shifted upon the mere proof of relationship and activity, on the part of the beneficiary child, in the preparation of the
 
 will....’
 

 “(Emphasis added.) See, also,
 
 Bain v. Bain,
 
 150 Ala. 453, 43 So. 562 (1907) (an action to set aside conveyances from a father to the wife of one of his sons and his son’s children).”
 

 631 So.2d at 993-94.
 
 [5]
 

 In the present case, there was evidence indicating that Malone’s relatives — including Furrow, June Helton, Lott, Gregory, and Gregory’s wife — would drive her places, help her into her bath, bring her meals, and write checks on her behalf. However, there is no evidence indicating that Furrow in particular assumed a dominant role over Malone or that she denied others access to her.
 

 Furrow testified that she drove Malone to the office of the attorney who drafted the 2003 will, and Gregory cites evidence suggesting that Furrow was present in the same room along with two witnesses and a notary when Malone executed the 2003
 
 *358
 
 will. Gregory also cites evidence suggesting that when June Helton died, Furrow and Lott were angered by the listing in Helton’s obituary of one “Jimbo Lambert” as Helton’s stepson even though Lambert apparently was not related to Helton or to Malone by marriage or otherwise. Bubba testified that Furrow told him Malone “was very upset that Jimbo Lambert was in the obituary” and “that we probably get [sic] the last thing we would ever get from my grandmother,” and that evidence suggests Furrow’s displeasure with the reference to Lambert in the obituary may have prompted her to talk to Malone about executing a new will. Further, Gregory cites Bubba’s testimony that Furrow “is a woman that had a lot of influence over” Malone, and he contends that the jury could have reasonably inferred that Furrow used that alleged influence, unduly during the time she was at Malone’s house before the 2003 will was executed. We disagree.
 

 Unlike the evidence in
 
 Ex parte Helms,
 
 there is no evidence in the present case that Furrow profited from Malone during the time leading up to Malone’s death or that she exercised exclusive control over Malone and denied others access to her during the time leading up to the execution of the 2003 will. Moreover, the lawyer who drafted the 2003 will for Malone was the same lawyer who had drafted her first will, unlike the situation in
 
 Ex parte Helms,
 
 and the attorney who drafted Malone’s 2003 will testified that he met with Malone a week before she executed the 2003 will. Specifically, the attorney testified that Malone met with him
 
 privately
 
 and told him that she wanted to execute a will containing the terms ultimately included in the 2003 will.
 

 Further, the witnesses to the 2003 will and the individual who notarized the 2003 will testified at trial, and those individuals testified uniformly that Malone did not exhibit signs of mental slowness when she executed the 2003 will, that she appeared to be of a sound mind, that she knew the extent of her bounty and her wishes in disposing of it, and that she claimed to be acting freely and voluntarily in signing the 2003 will. Although Bubba testified that Malone “probably took over 10 pills a day,” including Haldol, there was no evidence as to the possible side effects of those medications or evidence indicating that Malone had taken any of those medications on the day she executed the 2003 will. Finally, unlike the testator in
 
 Ex parte Helms,
 
 there was no evidence indicating that Malone was dependent on Furrow for all of her transportation in the time leading up to the execution of the 2003 will or immediately thereafter.
 

 The undisputed evidence at trial showed that during the last 10 years or so of Malone’s life, Furrow, who has lived in Louisiana for more than 30 years, visited Malone “three to four times every two months.” Furrow testified that she sometimes would come more often — “[i]t might be for 10 or 12 days.” Again, however, there was no evidence at trial indicating that Furrow ever exercised any degree of dominance or control over Malone during those visits or that Furrow denied others access to her during those visits. Furrow’s visits to her mother, her driving Malone to the lawyer’s office to execute the 2003 will, and her possibly sitting in the room in which the will was executed are no more dominating or controlling than were the actions of the son in
 
 Wilson, supra,
 
 which this Court held as a matter of law did not constitute substantial evidence of dominance or control.
 

 Likewise, Furrow’s actions in the present case are not analogous to the actions described in the following summary by the
 
 Wilson
 
 Court of cases illustrating dominating or controlling behavior:
 

 
 *359
 
 “[S]ee
 
 Haginas v. Haginas,
 
 598 So.2d 1334 (Ala.1992) (involving an elderly woman, confined to a nursing home, who was pressured by her son over a period of several years to execute a deed, the son threatening to stop his visits if she did not sign);
 
 Brothers v. Moore,
 
 349 So.2d 1107 (Ala.1977) (involving an elderly woman who could not read or write and whose son had taken over all of her business affairs);
 
 Gosa v. Willis,
 
 341 So.2d 699 (Ala.1977) (involving an elderly couple who had exhibited signs of mental feebleness, had little education, and whose former son-in-law had duped them into believing that the conveyance of their property to him would resolve a ‘tax problem’);
 
 Jackson v. Rodda,
 
 291 Ala. 569, 285 So.2d 77 (1973) (involving a man who had suffered a nervous breakdown after his wife was accidentally killed and whose daughter not only had looked after him and advised him in his personal affairs, but also had ‘insisted’ that he convey his property to her and had promised to ‘do the right thing by the other children,’ and then refused to reconvey the property to her father at his request);
 
 Orton v. Gay,
 
 285 Ala. 270, 231 So.2d 305 (1970) (involving an elderly woman who, shortly after the death of her husband, conveyed her real property and turned over significant holdings of personal property to her daughter, who clearly had manipulated her so as to obtain her property); and
 
 Jones v. Boothe,
 
 270 Ala. 420, 119 So.2d 203 (1960) (involving an elderly couple who had conveyed their property to their daughter shortly before the death of the father, under circumstances clearly indicating that the daughter had secretly lied to and pressured the couple in an attempt to avoid the operation of the father’s will). We find it significant that in each of the last four cases mentioned above at least one of the grantors was alive at the time of the trial and testified directly with respect to the question of dominance. In the first case cited,
 
 Haginas v. Haginas,
 
 the grantor was coerced into executing the deed by repeated threats on the part of her son that he would not visit her in the nursing home if she did not cooperate with him, and in the second case,
 
 Brothers v. Moore,
 
 the evidence indicated that the grantor was illiterate, in addition to being totally dependent on her son to handle her business affairs. These cases, we think, are materially distinguishable from the present case.”
 

 Wilson,
 
 631 So.2d at 994-95.
 

 In
 
 Hall v. Hall,
 
 502 So.2d 712, 714 (Ala. 1987), this Court stated that “there must be active interference [by the dominant party] in procuring the execution of the will, and such interference must go beyond compliance with the voluntary directions of the testator.” In
 
 Hall,
 
 the testator executed a will making his second wife, Theresa, the sole beneficiary of his estate; the will made no provision for his three adult children from his first marriage. One of those children contested the will, alleging that Theresa had exerted undue influence. This Court held that there was not a scintilla of evidence indicating that Theresa had exercised dominance over the testator or actively interfered in procuring the execution of the will.
 
 [6]
 
 502 So.2d at 713-14. This Court stated:
 

 . “This Court has consistently held that the fact that a person is a favored beneficiary and is in a confidential relationship with the testator does not alone
 
 *360
 
 raise a presumption that the will was executed by undue influence.
 
 Arrington v. Working Woman’s Home,
 
 [368 So.2d 851 (Ala.1979) ],
 
 Kahalley v. Kahalley,
 
 248 Ala. 624, 28 So.2d 792 (1947);
 
 Lockridge v. Brown,
 
 184 Ala. 106, 63 So. 524 (1913). In addition to the confidential relationship, there must be active interference in procuring the execution of the will, and such interference must go beyond compliance with the voluntary directions of the testator. Arrington v. Working Woman’s Home, supra. ference in procuring the execution of the will, and such interference must go beyond compliance with the voluntary directions of the testator.
 
 Arrington v. Working Woman’s Home,
 
 supra.
 

 “In
 
 Arrington v. Working Woman’s Home,
 
 supra, this Court stated:
 

 “ ‘The scintilla rule is not satisfied by speculation. [Citation omitted.] Moreover, evidence to support undue influence must provide at least a reasonable inference, rather than mere suspicion. [Citation omitted.]’
 

 “The affidavits submitted by the contestant do not provide any facts which show undue activity on the part of Theresa in procuring the execution of Floyd Sr.’s will. The affidavits state in conclusory fashion that Theresa was the dominant person in the marriage. These statements appear to be based upon speculation or suspicions of the affiants. There is no evidence that the will was the result of anything other than the strong bond of love and affection between Theresa and Floyd.”
 

 502 So.2d at 714.
 

 In the present case, Gregory did not present substantial evidence indicating that Furrow unduly influenced Malone or that she caused Malone to do something Malone did not independently want to do. The evidence does not suggest that Malone ever went “beyond compliance with the voluntary directions of the testator.”
 
 Hall,
 
 502 So.2d at 714. Consequently, under
 
 Wilson, supra,
 
 and
 
 Hall, supra,
 
 Gregory did not present substantial evidence of undue influence, and the trial court erred in denying Furrow’s motion for a JML on the undue-influence claim.
 
 [7]
 

 Conclusion
 

 The trial court’s judgment is reversed, and the cause is remanded for proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 COBB, C.J., and SEE, WOODALL, and PARKER, JJ., concur.
 

 [1]
 

 . Because of our disposition of this appeal, we need not decide the issue whether Furrow is a favored beneficiary.
 

 [2]
 

 . Specifically, Gregory testified that for approximately two years before the 2003 will was executed, Malone was "feeble.” He testified that Malone would "hallucinate, see things,” and that "[s]he would repeat herself. She would tell you one thing, five minutes later she would tell you the same thing. You would sit there an hour and she would tell you the story three or four times.” Bubba testified that Malone was "a very unstable woman” a week or so after June Helton’s death in November 2003 and was still "crying every day” about Helton's death. Bubba testified that Malone said "off-the-wall things” during that time. Winfred, Sr., testified that Malone would often repeat things.
 

 [3]
 

 .In that regard, Bubba testified as follows:
 

 "Q. As far as you know, based on your observations, did anyone care for Ms. Malone during the say two- or three-year period before your mother passed on in 2003?
 

 "A. My Aunt Sarah come down in the evening and brought her supper.
 

 "Q. Did anybody else go by there and care for her?
 

 “A. My mother and father.
 

 “Q. Did you have the opportunity to go into your grandmother's house on few or many occasions?
 

 
 *355
 
 "A. Many occasions.
 

 "Q. And while you were there, did you ever have an opportunity to observe if she was — had any medications sitting around there?
 

 "A. Yes, sir. She probably took over 10 pills a day.
 

 “Q. And do you know if you ever saw the prescriptions what those were for?
 

 "A. The only prescription that I really realized what — me and my ex-wife Dana was in there looking to get her medicine ready for her one day and it was Haldol and it stood out for her — her grandmother had Alzheimer’s and that's what the medication was for.
 

 “Q. I see, sir. Did you ever have an opportunity to see your grandmother take the medication?
 

 "A. Yes, sir.
 

 “Q. And on few or many occasions?
 

 "A. Few occasions.”
 

 [4]
 

 . Lortab consists of "hydrocodone, a synthetic morphine-like narcotic.” 873 So.2d at 1145.
 

 [5]
 

 . Gregory contends that
 
 Wilson
 
 is distinguishable because it involved an action to cancel a deed rather than a will contest; Gregory asserts that the principles governing the "legal shifting of the burden” in an action seeking to set aside an inter vivos transfer "is distinct from wills.” We disagree that
 
 Wilson
 
 is distinguishable on that basis. Many of the authorities cited in
 
 Wilson
 
 as to the claim of undue influence involved claims of undue influence in the actions contesting wills.
 
 See,
 
 e.g.,
 
 Wilson,
 
 631 So.2d at 992-94 (citing and quoting extensively from
 
 Chandler v. Chandler,
 
 514 So.2d 1307 (Ala.1987), and
 
 Keeble v. Underwood,
 
 193 Ala. 582, 69 So. 473 (1915), both of which involved will contests).
 

 [6]
 

 . Effective June 11, 1987, the scintilla rule was abolished in favor of the substantial-evidence rule.
 
 See
 
 § 12-21-12, Ala.Code 1975.
 

 [7]
 

 . Because there was not substantial evidence showing that Furrow dominated or controlled Malone or otherwise unduly influenced the making and execution of the 2003 will, we pretermit consideration of Furrow’s argument that she was not a favored beneficiary under the 2003 will.