BRYAN, Judge.
 

 Louise Motherway (“Louise”) is the proponent of a will executed by her father, M.C. Murphy (“M.C.”), on March 5, 2002 (“the 2002 will”). M.C.’s other child, Joe Murphy (“Joe”), contested the 2002 will in the Jefferson Circuit Court and requested a jury trial. At trial, Louise orally moved for a judgment as a matter of law (“JML”) at the close of Joe’s case-in-chief. The trial court granted that motion and later entered both a judgment in favor of Louise and an amended judgment in favor of Louise by executing separate written documents. From the amended judgment in favor of Louise, Joe appeals. We affirm.
 

 Facts
 

 The following facts are undisputed. M.C. was born in 1911. Louise and Joe were born of M.C.’s first marriage and are his only children. Louise was born in 1933, and Joe in 1937. M.C. and his first wife divorced in 1954. Following a second marriage that produced no children and ended in divorce, M.C. married Maxine Krout, who had no children, in 1958. No children were born of M.C.’s marriage to Maxine. M.C. remained married to Maxine until she died on December 23, 2001, at the age of 90.
 

 During their marriage, M.C. farmed a parcel of real property (“the farm”) that his father, Monroe Murphy, had deeded to him; the farm contained approximately 245 acres. There is a site located approximately in the northwest quadrant of the farm that the parties refer to as Monroe Murphy’s home site. There is another site located approximately in the southwest quadrant of the farm that the parties refer to as Louise and Joe’s birth site. In addition, there are two lakes located approximately in the southeast quadrant of the farm. In approximately 1972, M.C. and Maxine acquired a parcel of land in Brent and built a home on it (“the Brent home”).
 

 Maxine, who had worked for a bank, paid all of her and M.C.’s bills and handled all their bank accounts before she died. If M.C. purchased an item at a store with a check, he signed a blank check and handed it to the cashier for him or her to complete.
 

 In 1973, M.C. executed a will that left all of his property to Louise and Joe in equal shares if Maxine predeceased him. In 1990, Louise bought a three-acre portion of the farm that included Monroe Murphy’s home site. During a family gathering the week before Christmas 1990, M.C. asked
 
 *773
 
 Louise what part of the farm she would like to have. When M.C. asked the question, Maxine was in the room, but Joe was not. Louise responded that she would like to have Louise and Joe’s birth site and the two lakes. M.C. and Maxine then called Joe into the room. M.C. told Joe he was going to divide the farm between Louise and Joe; that Louise had requested Monroe Murphy’s home site, Louise and Joe’s birth site, and the two lakes; and that Joe would receive the rest of the farm. Joe testified that he was surprised by M.C.’s proposal to divide the farm between Louise and him and that he expressed his gratitude.
 

 Joe testified that, after that conversation, he went to the courthouse to gather information about the farm. He further testified that, without knowing that Louise had already bought a three-acre portion of the farm containing Monroe Murphy’s home site, he called M.C. on December 27, 1990, and suggested a different division of the farm than that proposed by M.C. According to Joe, M.C. was “testy” in response to Joe’s proposing an alternative method of dividing the farm and said that “he did not have to give the property away, that he could sell it.”
 

 Joe testified that he still did not know that Louise had purchased a three-acre portion of the farm containing Monroe Murphy’s home site when he sent M.C. and Maxine a letter on December 28, 1990, suggesting that, for purposes of M.C.’s giving the farm to Louise and Joe, the farm should be divided into a 122-acre parcel containing Louise and Joe’s birth site and a 123-acre parcel containing Monroe Murphy’s home site and the two lakes. The letter further suggested that Louise be given her choice of those two parcels or that she and Joe draw lots to determine which of those two parcels each of them would receive.
 

 Joe testified that M.C. did not respond to his December 28, 1990, letter and that he assumed that M.C. was angry at him. Louise and her two sons, Mike and Mark Motherway, all testified that M.C. had told them that Joe’s December 28, 1990, letter made him angry.
 

 The undisputed evidence established that, in 1991, M.C. and Maxine went to attorney Mike Murphy, a distant relative of M.C., to have new wills prepared. Mike Murphy prepared new wills for them, and M.C. executed his on July 3, 1991 (“the 1991 will”). The 1991 will provided that, if Maxine predeceased M.C., Joe would receive a 58-acre parcel of real property and that Louise would receive all the rest of M.C.’s property.
 

 The undisputed evidence also established that, in 1996, M.C. and Maxine executed new wills (“the 1996 wills”). Each of the 1996 wills created a spousal trust and a family trust. Maxine’s 1996 will named her nieces and nephews as her residuary beneficiaries, while M.C.’s 1996 will named Louise and Joe as his residuary beneficiaries and provided that Louise would receive the Brent home and that all the rest of his property would be divided equally between Louise and Joe.
 

 It is also undisputed that, in 1997, M.C. and Maxine executed a deed conveying all their jointly owned property, including the Brent home and the farm, to Louise and Joe subject to a life estate retained by M.C. and Louise. For reasons undisclosed by the record, however, M.C. and Maxine did not tell either Louise or Joe about the deed conveying M.C. and Maxine’s jointly owned property to them at that time.
 

 Louise testified that, after Maxine died, M.C. asked her to pay his bills and help him with his financial affairs. The evidence was undisputed that M.C. had difficulty reading; however, the evidence re
 
 *774
 
 garding the cause of that difficulty was inconclusive. Louise testified that M.C. could read without difficulty until he began to suffer from macular degeneration late in life. One of Louise’s sons suggested that the paucity of M.C.’s formal education was a cause of his difficulty in reading. Louise testified that M.C. left school after the sixth or seventh grade, while one of Louise’s sons testified that M.C. left school after the third or fourth grade.
 

 Attorney Mike Murphy testified that M.C. and Louise came to his office on January 2, 2002, a little over a week after Maxine died. Mike Murphy testified that he explained to M.C. the spousal trust and family trust created by Maxine’s 1996 will and that M.C., whose 1996 will also provided for the creation of a spousal trust and a family trust, stated that he did not want a spousal trust and family trust in his will and that he wanted a simple will instead. Mike Murphy testified that he met with M.C. on at least two other occasions to discuss the terms of a new will, and Louise did not accompany M.C. on at least one of those visits. Mike Murphy testified that, in his meetings with M.C., M.C. told him what he wanted done with his property and that M.C. did not act any differently when Louise was present than he did when Louise was absent. Mike Murphy further testified that, on February 12, 2002, he sent M.C. a draft of a new will. That draft provided that Louise would receive one-half of M.C.’s property and that her children, Mark and Mike Motherway, would receive the other half. Mike Murphy testified that M.C. subsequently requested that the draft of the will be changed to provide that Louise would receive all of his property if she survived him and that, if she did not survive him, her children would receive all of his property. Mike Murphy testified that he made that change, and, with that change, the draft became the 2002 will. Mike Murphy testified that M.C. then made an appointment to execute the 2002 will on March 5, 2002, and that Louise accompanied M.C. to Mike Murphy’s office where M.C. executed the 2002 will. Mike Murphy further testified that, at M.C.’s express request, both the initial draft of the will that Mike Murphy had sent M.C. on February 12, 2001, and the 2002 will stated that M.C. had already made provision for Joe by deeding him a one-half interest in certain real property.
 

 Mike Murphy also testified that he had not had any dealings with Louise before he drafted the 2002 will and that he had drafted the 1991 will for M.C. Mike Murphy testified that, in his dealings with M.C., he did not observe any signs that Louise was imposing her will on M.C. Mike Murphy witnessed M.C.’s execution of the 2002 will, and he testified that, in his opinion, M.C. executed the 2002 will freely and voluntarily and that the 2002 will expressed M.C.’s wishes.
 

 Mike Murphy testified that, in June 2002, M.C. had him prepare a correction deed correcting the 1997 deed executed by M.C. and Maxine. The correction deed indicated that the conveyance of the Brent home jointly to Louise and Joe was a mistake and conveyed the Brent home to Louise alone. Mike Murphy testified that he advised M.C. that it would be better to ask Joe to execute a quitclaim deed divesting him of any interest in the Brent home; however, M.C. indicated that he did not want to ask Joe to sign a quitclaim deed.
 

 Bernice Stacy (“Bernice”), Maxine’s 91-year-old sister, testified that a dispute had arisen between her and M.C. regarding the disposition of some of Maxine’s property after her death. Bernice testified that Maxine had told her that her name was on three of Maxine’s bank accounts and one of her certificates of deposit and that M.C. would give her the proceeds of those bank
 
 *775
 
 accounts and that certificate of deposit upon Maxine’s death. Bernice testified that, after Maxine’s death, M.C. told Bernice to come to the bank and he would give her the proceeds of the certificate of deposit. Bernice testified that, when she arrived at the bank, M.C., Louise, and two bank employees were present and that M.C. and Louise were whispering to one another. Bernice testified that one of the bank employees had Bernice sign the certificate of deposit with a piece of paper covering up the amount of the certificate of deposit. Bernice testified that she was then given some money but that she later learned that she had been given only one-half of the proceeds of the certificate of deposit. Bernice testified that she did not receive any of the proceeds of the bank accounts that Maxine had told her she would receive.
 

 Documentary evidence indicated that one-half of the proceeds of the certificate of deposit with Bernice’s name on it and the proceeds of the three bank accounts with Bernice’s name on them were deposited in accounts that had M.C.’s and Louise’s names on them and that the disposition of those accounts was governed by contracts providing that, upon the death of one of the owners, the account would become the sole property of the survivor. Louise testified that M.C. asked her to accompany him to the bank for his meeting with Bernice regarding the certificate of deposit that had Bernice’s name on it and that she did so because he requested it; however, she testified that M.C. drove them there, that M.C. did not ask for her advice regarding what to do with the certificate of deposit, and that she did not give him any advice. She testified that M.C. took the certificate of deposit out of the safety deposit box and gave it to a bank employee. Louise also testified that M.C. instructed her to set up bank accounts that were in her and M.C.’s names and that he instructed her to make the deposits to those accounts.
 

 Bernice also testified that, while Maxine was alive, she had had some of their mother’s furniture in the Brent home and that when Bernice went to get that furniture following Maxine’s death, M.C. told her that she could not come into the house. Bernice testified that Louise was not present on that occasion.
 

 In addition, Bernice testified that, approximately 11 months after Maxine’s death, she employed an attorney and sued M.C. to recover property of Maxine’s that Bernice believed she was due. Bernice testified that her action was mediated and that Louise accompanied M.C. to the mediation. Bernice further testified that, during the mediation, Louise did most of the talking on behalf of M.C., that Louise made a number of demands on behalf of M.C., that Bernice acquiesced to those demands, and that Bernice and M.C. agreed upon the terms of a settlement of Bernice’s claims. However, according to Bernice, M.C. subsequently refused to implement the terms of the settlement, and her action is still pending against M.C.’s estate. Finally, Bernice testified that M.C. was a strong-willed and intelligent person who had a strong temper.
 

 A dispute also arose between M.C. and Maxine’s family regarding the funding of the spousal and marital trusts created by Maxine’s 1996 will. M.C. asserted that Maxine’s 1996 will required that the spousal trust be funded before the family trust, while Maxine’s family asserted that her will required that the family trust be funded before the spousal trust. That dispute led to litigation that resulted in a 2007 decision of the Alabama Supreme Court holding that the will required that the family trust be funded before the spousal
 
 *776
 
 trust.
 
 [1]
 

 Joe Crocker was M.C.’s best friend. He testified that M.C. told him that Joe was not happy with the way M.C. had proposed to divide the farm, so M.C. had deeded the farm to both Louise and Joe so that they could settle how it should be divided. Crocker testified that it would not surprise him that M.C. had favored Louise in his will because M.C. was pleased that Louise and Maxine had become “buddies.” He also testified that M.C. was somewhat afraid of Joe, that M.C. was a strong-willed person who could not be pushed around, that M.C. wanted to see Louise often after Maxine died, and that Crocker never saw any evidence indicating that Louise was imposing her will on M.C.
 

 Crocker’s daughter, Karen Berklew, was also close to M.C. She testified that, although M.C. was grieving over Maxine’s death, he never showed any signs of incompetence after Maxine’s death. Berk-lew testified that M.C. told her that he was grateful to Louise for taking care of him after Maxine’s death. She further testified that she saw no signs that Louise was imposing her will on M.C. and that, after M.C. moved into Louise’s house toward the end of his life, Louise never tried to restrict anyone’s access to M.C. Indeed, Berklew testified that, whenever she visited M.C., Louise would leave the room and give them privacy. She also testified that M.C. made his own decisions and had a strong will.
 

 Joe testified that he had resumed a normal relationship with M.C. within a few years after he had suggested an alternative method of dividing the farm in 1990 and that he and his father were on good terms from that point until his father’s death.
 

 Procedural History
 

 After M.C.’s death, Louise offered the 2002 will for probate, and the Probate Court of Jefferson County admitted it to probate. Thereafter, on July 2, 2007, Joe filed a will-contest action in the Jefferson Circuit Court, alleging that Louise had procured M.C.’s execution of the 2002 will by exercising undue influence. Louise answered Joe’s complaint with a general denial. Subsequently, Joe amended his complaint to add a claim alleging that Louise, by exercising undue influence, had convinced M.C. to make her a joint owner, with right of survivorship, of checking accounts, certificates of deposit, and investment accounts that had previously been in M.C.’s name only, in the names of both M.C. and Maxine, or in the names of M.C., Maxine, and Bernice. Louise answered Joe’s amended complaint with a general denial. After Louise unsuccessfully moved for a summary judgment, the action proceeded to trial before a jury, which, as noted above, resulted in the trial court’s entering a JML in favor of Louise.
 

 In pertinent part, the trial court’s judgment, as amended, stated:
 

 “This matter came on to be heard May 18, 2009 for a trial by jury. This case involved a will contest, whereby the contestant, Joe Murphy ..., claimed undue influence by the proponent, Louise Motherway....
 

 [[Image here]]
 

 “At the close of [Joe’s] case-in-chief, [Louise] moved for a Judgment as a Matter of Law, which this Court granted.
 

 “In a will contest based upon undue influence, the contestant must offer substantial evidence showing:
 

 
 *777
 
 “1. That a confidential relationship existed between a favored beneficiary and the testator;
 

 “2. That the influence of the beneficiary was dominant and controlling in that relationship; [and]
 

 “3. That there was undue activity on the part of the dominant party in procuring the execution of the will.
 

 “It is undisputed that a confidential relationship exist[ed] between [Louise] and [M.C.]. [Louise] was the daughter and the caregiver of [M.C.] and assisted [M.C.] in many of his affairs.
 

 “The Court found from listening to all of the witnesses and reviewing evidence it had before it that [Joe] failed to meet his burden of proof. There was a lack of substantial evidence that [Louise] exercised undue influence over [M.C.]. There was no evidence presented that [Louise] forced or coerced [M.C.] to do anything against his will. There was no evidence presented that [Louise] excised dominance over [M.C.] or that [M.C.] became subservient or subordinate to the will of [Louise], the Proponent.
 

 “Attorney Michael Murphy, a witness for [Joe], testified that he prepared [the 2002 will] and that there were occasions when [M.C.] came unaccompanied by [Louise] to discuss his affairs. There was no direct testimony that [Louise] unduly influenced [M.C.] in any way in preparing his will. There was no evidence that [M.C.’s] will was subordinate to that of [Louise], the Proponent.
 

 “Witnesses [called by Joe, and Joe himself, testified] that [M.C.] was a strong-willed man and that he did not suffer from a diminished mental capacity. Karen Crocker Berklew- testified that [M.C.] was of very sound mind to make his own decisions about things and that he had a strong will to back it up. Another witness for [Joe], Joe Crocker, testified that he saw [M.C.] often and that he never questioned his mental competency. He further testified that [M.C.’s] mind was sharp for his age. Mr. Crocker, in response to a question from [Joe’s] attorney [asking] whether he had ever observed [Louise] pushing [M.C.] around or dominating him in any way responded, ‘You couldn’t push him around.’ When asked if [M.C.] was a strong-willed person, the witnesses] response was, ‘yes.’ [Joe] himself did not testify that in any instance [M.C.’s] will was subordinate to that of [Louise].
 

 “Therefore it is ORDERED, ADJUDGED and DECREED that Judgment as a Matter of Law is GRANTED for [Louise].”
 

 (Capitalization in original.)
 

 Joe timely filed a Rule 59, Ala. R. Civ. P., motion, which the trial court denied. Joe then timely appealed to the supreme court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
 

 Analysis
 

 “ ‘ “When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. In reviewing a ruling on a motion for a JML, this
 

 
 *778
 
 Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling.” ’
 

 “City of Birmingham v. Brown,
 
 969 So.2d 910, 915 (Ala.2007) (quoting
 
 Waddell & Reed, Inc. v. United Investors Life Ins. Co.,
 
 875 So.2d 1143, 1152 (Ala.2003)).
 

 [[Image here]]
 

 “ ‘JML in favor of a movant who does
 
 not
 
 assert the claim or affirmative defense but who only opposes it, and who therefore does not bear the burden of proof, is appropriate in either of two alternative cases. One is that the claim or affirmative defense is invalid in legal theory.
 
 See Harkins & Co. v. Lewis,
 
 535 So.2d 104 (Ala.1988). The other is that one or more contested essential elements of the claim or affirmative defenses is unsupported by substantial evidence.
 
 See Banks v. Harbin,
 
 500 So.2d 1027 (Ala.1986), and
 
 McKerley [v. Etowah-DeKalb-Cherokee Mental Health Bd., Inc.,
 
 686 So.2d 1194 (Ala.Civ.App.1996) ]. If either alternative be true, JML is appropriate.
 
 See Harkins, supra, Banks, supra,
 
 and
 
 McKerley, supra.
 
 If, however, the nonmovant’s claim or affirmative defense is valid in legal theory and is supported by substantial evidence on every contested element, JML is inappropriate irrespective of the presence or weight of countervailing evidence.
 
 See Driver [v. National Sec. Fire & Cas. Co.,
 
 658 So.2d 390 (Ala.1995) ], and
 
 First Financial [Ins. Co. v. Tillery,
 
 626 So.2d 1252 (Ala.1993) ].’
 

 “Ex parte Helms,
 
 873 So.2d 1139, 1143-44 (Ala.2003).”
 

 Furrow v. Helton,
 
 13 So.3d 350, 353 (Ala.2008).
 

 In the case now before us, Joe argues that the trial court erred in granting Louise’s motion for a JML because, he says, he introduced substantial evidence establishing all three of the essential elements of a claim of undue influence. In order to establish a prima facie case of undue influence a claimant must introduce substantial evidence establishing:
 

 “ ‘(1) that a confidential relationship existed between a favored beneficiary and the testator; (2) that the influence of or for the beneficiary was dominant and controlling in that relationship; and (3) that there was undue activity on the part of the dominant party in procuring the execution of the will.’ ”
 

 Furrow,
 
 13 So.3d at 353-54 (quoting
 
 Clifton v. Clifton,
 
 529 So.2d 980, 983 (Ala.1988)).
 

 There is no dispute that Louise had a confidential relationship with M.C. and was a favored beneficiary under the 2002 will. However, Joe did not introduce substantial evidence indicating that Louise’s influence was dominant and controlling in her relationship with M.C. or that she engaged in undue activity in procuring the execution of the 2002 will, the execution of the 2002 correction deed conveying the Brent home to her alone, or M.C.’s placement of funds in accounts in his name and Louise’s name with a survivorship clause. Our supreme court “has consistently held that the fact that a person is a favored beneficiary and is in a confidential relationship with the testator does not alone raise a presumption that the will was executed by undue influence.”
 
 Hall v. Hall,
 
 502 So.2d 712, 714 (Ala.1987). Every witness who knew M.C., including Joe, testified that M.C. was a strong-willed person.
 
 *779
 
 No witness testified that he or she saw any sign that Louise had imposed her will on M.C. Aside from the fact that the execution of the 2002 will, the execution of the 2002 correction deed, and the opening of the bank accounts in M.C.’s and Louise’s names with a right of survivorship favored Louise, there is no evidence whatsoever indicating that her influence was dominant in her relationship with M.C., and, as noted previously, the mere fact that the execution of the 2002 will, the execution of the 2002 correction deed, and the opening of the bank accounts in M.C.’s and Louise’s names with a right of survivorship favored Louise does not raise a presumption that they were procured by undue influence.
 
 See Hall v. Hall.
 

 Moreover, there is no evidence indicating that Louise engaged in any undue activity to procure the execution of the '2002 will, the execution of the 2002 correction deed, or the opening of the bank accounts in M.C.’s and Louise’s names with a right of survivorship. M.C. had a prior relationship with Mike Murphy before Mike Murphy prepared the 2002 will and the 2002 correction deed — Mike Murphy had prepared the 1991 will. Louise, on the other hand, had no prior relationship with Mike Murphy. Although Louise accompanied M.C. on some of his visits to Mike Murphy’s office to discuss the 2002 will, she did not accompany him on all the visits. Mike Murphy testified that M.C. stated what terms he wanted in the 2002 will and that he saw no evidence indicating that Louise was imposing her will on M.C. Mike Murphy testified that M.C. had stated that he wanted the 2002 correction deed, that Mike Murphy had advised M.C. to ask Joe to quitclaim his interest in the Brent home instead of executing the correction deed, and that M.C. had not wanted to ask Joe to quitclaim his interest in the Brent home. There is no evidence indicating that Louise was involved in procuring the preparation or execution of the 2002 correction deed. There was evidence indicating that Louise was involved in the opening of the bank accounts in M.C.’s and Louise’s names with a right of survivor-ship; however, there was no evidence indicating that she was doing anything other than complying with the voluntary directions of M.C. In order to establish the undue-activity element of an undue-influence claim, there must be interference by the allegedly dominant party “‘and such interference must go beyond mere compliance with the voluntary directions of the testator.’ ”
 
 Furrow,
 
 13 So.3d at 359 (quoting
 
 Hall,
 
 502 So.2d at 714). Accordingly, we affirm the judgment of the trial court.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.
 

 [1]
 

 .
 
 Scholl v. Stacy,
 
 981 So.2d 1116 (Ala.2007).